(Decided 19th June, 1890.)

R. SNOWDEN ANDREWS, CHARLES G. PETERS and J. F. SCHENCK, Co-partners *vs.* GABRIEL D. CLARK.

*Liability of Principal for Fraud of Agent—Instructions— Estoppel—Fraudulent conversion—Interest—Presumption of Continuance of Authority of Agent.*

The defendants were stock-brokers, with their principal house and place of business in New York, with a branch house in the City of Baltimore. Orders given for the sale or purchase of stock by a customer in Baltimore were executed by the house in New York; but stocks or bonds were received and delivered by the house in Baltimore, and accounts were rendered and settled there with the customers dealing with the branch house. The plaintiff was a customer of the branch house of the defendants, and dealt in stocks and other securities quite extensively for some years, the most of his dealings being transacted with P., who was in the employ of the defendants. The regular course of dealing and method of conducting the business, where debits and credits were frequent, was to furnish to customers monthly statements of account, made up in New York, and furnished to the Baltimore house for delivery. These were furnished for and delivered to the plaintiff, though with some irregularity during the latter part of the dealing. The defendants purchased certain stocks for the plaintiff, which were paid for by him. They were received by the defendants in Baltimore to be delivered

Andrews, *et al. vs.* Clark.

to the plaintiff, but instead of the genuine certificates of the stocks purchased by the defendants, raised or forged certificates were delivered to the plaintiff on the 18th of December, 1885, by P. professing to act for and in the name of the defendants, and at the same time claiming and receiving of the plaintiff a check for $4,138.31, as being the amount due the defendants from the plaintiff for the stocks then professed to be delivered, when, in fact, there was nothing due to the defendants. Some short time before the 18th of December, after repeated requests made by the plaintiff for the statement of his account with the defendants, P. furnished statements dated respectively 1st of November, and 1st of December, 1885, which were afterwards, and before the 18th of December discovered to be false and simulated, and upon such discovery, correct copies were requested by the plaintiff, and were forthwith furnished to him, and he had them in his possession on the 18th of December, 1885. In one of these statements certain stock was entered as delivered under date of 5th of October, 1885, and in another as delivered under date of 4th of November, 1885. On the 18th of December, just before P. delivered the forged certificates to the plaintiff, and received his check, a clerk of the defendants delivered to the plaintiff a statement of account to the 17th of December, 1885, and certain shares of stock, and received of him a check as being in full of the amount due the defendants to that date. The memorandum statement delivered by P. to the plaintiff, was not in the form of any prior statement that had been furnished, but quite different. The forged certificates were put carefully away by the plaintiff, and their true character was not discovered until sometime in June, 1886, when they were taken to the offices of the railroads for transfer. On discovering the fact of the false and simulated statements furnished to the plaintiff, the defendants dismissed P. from their service, prior to the transaction of the 18th of December, 1885, but the plaintiff had no knowledge of this discharge. The duties and powers of P. comprehended the receiving of orders for the purchase and sale of stocks and securities; the transmission of such orders to the New York house; the receipt of securities and the delivery thereof to customers; and, occasionally, the delivery of monthly statements to those entitled to receive them; and especially were such duties performed by him in the transactions had by the plaintiff with the defendants. The prayers granted by the Court concluded to the right of the plaintiff to recover for the stocks and the check, and submitted only the question of whether the acts of P. were within the scope of his authority. HELD:

1st. That as one of the defences relied on was that the plaintiff was estopped by his conduct from recovering, the prayers should have submitted for consideration, as reflecting upon the question of estoppel, all the circumstances immediately connected with the fraud of P. in dealing with the stocks purchased by the defendants for the plaintiff; the furnishing the plaintiff with the false and simulated statements of account; the discovery thereof, and the correction by duplicates of the true accounts, and what those accounts indicated as to the previous dealing; the subsequent delivery to the plaintiff of the raised and forged certificates of the stock, and all the circumstances of the settlement by the plaintiff with P. and the passing of the check to the latter on such settlement; and all the facts and incidents of those transactions, and the facts immediately connected therewith, and the subsequent discovery of the fraud—as tending to show that the plaintiff had such means and facilities at his command for the prevention or detection of the fraud of P. as would have enabled him, by the exercise of ordinary prudence and care, such as reasonably careful business men generally exercise in such transactions, to prevent the fraud, or to discover it within a reasonable time after its perpetration, so as to afford the defendants an opportunity to seek restoration or indemnity of P.

2nd. That the fact that the plaintiff repeatedly requested P., as the agent of the defendants, to deliver the particular stocks in question, and that he delayed, and offered excuses, which were accepted by the plaintiff, and that the latter did not complain to the defendants of such delay, would not constitute a ground of estoppel.

3rd. That as the stocks were purchased for the plaintiff, and were paid for by him, and were fraudulently converted by P. to his own use, and in no way for the use and benefit of the defendants, the measure of recovery against the defendants should be the value of the stocks at the time they were charged as delivered, with interest from such time, and not the value at the time of their conversion.

4th. That interest on the check was properly allowed from the date of its delivery to P.

If a person has dealt with an agent within the limit of the authority confided to him, or within a course of business by the agent which has been sanctioned and approved by the principal, such person has the right to assume, if not otherwise informed, that

the authority in the agent continues; and, when the dealing continues after the authority is' revoked, the principal is nevertheless bound, unless notice of the revocation of authority is brought home to the party so dealing with the supposed agent.

A party who employs an agent, and puts him in a position of trust to transact business with third parties, cannot be relieved of liability for the frauds and misdoings of such agent, unless it be shown that the loss sustained, as the result of such frauds, would not have occurred but for the neglect and want of ordinary care on the part of the person seeking to hold the principal liable; nor can the principal be relieved in such case, if, by the exercise of due and reasonable care in respect to the duties of the agent, the loss would not have occurred.

APPEAL from the Court of Common Pleas.

The case is stated in the opinion of the Court.

*Exception.*—The plaintiff offered the eight prayers following :

1. If the Court shall find from the evidence that during the years 1884 and 1885 the defendants were partners in business in the City of Baltimore and in the City of New York, under the respective names, in each city stated in the evidence, and that the business in which they were engaged was that of stock-brokers, and consisted in buying and selling for their customers stocks and other securities on commission, and that the sales and purchases of such stocks and securities were made at the Stock Exchange in the City of New York, and that the mode of doing said business for customers in the City of Baltimore was for the said house of Andrews, Peters and Company, to receive from said customers, at its place of business, No. 6 South street, in the City of Baltimore, orders for the purchase or sale of securities, and upon receiving said orders, to send them by private wire for execution to the house in New York, and that where such

securities were purchased for delivery to said customers, the same would be sent by the New York house to the Baltimore house, to be by it delivered to said customers, and that the only one of the said defendants who lived in Baltimore was the defendant, R. Snowden Andrews, and that in January, 1884, Nelson Palmer was employed as a clerk by the defendants, in their office in Baltimore, and that from January, 1884, to about the middle of July, 1884, said Palmer was the only person employed in said office, except the telegraph operator and two boys, and that during said period said Palmer kept such books as were kept in the Baltimore office, and received orders for the purchase of stocks from customers, and attended to the delivery of the same to said customers when received from New York, and in the absence of the defendant Andrews attended to the general business of said house in Baltimore; and that in July, 1884, the witness, Rhett, was employed as a clerk and book-keeper in the office of said house in Baltimore, but the said Palmer continued as clerk in said office after the employment of said Rhett, and as such, by the authority of the defendants, received orders from customers of the defendants for the purchase of stocks, and transmitted them by the private wire of the defendants to the house in New York, and also delivered to customers stocks and securities when received in Baltimore from the New York house, and delivered to him for that purpose for the witness, Rhett, and was authorized in the absence of said Rhett to receive, and did receive from the express company, packages of securities sent from the New York house to the Baltimore house, and from time to time received money paid to the house by its customers, and deposited the same in the banking house of Robert Garrett & Sons, in which house the Baltimore house kept its accounts; and that in the month of May, 1884, the defendants began to buy for plaintiff stocks and securities, and continued to

Andrews, *et al. vs.* Clark.

do so, as shown, during the remainder of the year 1884, and up to and after November, 1885, as shown by the evidence ; and that as to the business so transacted, by the defendants for the plaintiff, that part of it which was transacted in the City of Baltimore, was, with the authority of the defendants, chiefly transacted by the said Nelson Palmer, and that as part of such business, it was his duty on behalf of the defendants, to deliver to the plaintiff such stocks as were purchased for him by them, when received from New York, and he was also authorized by defendants to receive, and did receive, on their behalf from the plaintiff, payments of such money as became due by him from time to time, and was also authorized to deliver to the plaintiff statements of accounts between the plaintiff and defendants, and that all statements of such accounts as were delivered to the plaintiff, were delivered by said Palmer, except the two which said Rhett testified were delivered by him ; and that the defendants purchased in New York, for the plaintiff, 400 shares of the common stock of the New York, Lake Erie and Western Railroad Company, in pursuance of an order for this purpose given by the plaintiff to the Baltimore house, and transmitted by it ; and that said stock having been paid for by the plaintiff, was on November 4th, 1885, sent by Adams Express Company from the New York house to their Baltimore house, for delivery to the plaintiff, and that said stock was by said express company, on the 5th day of November, 1885, delivered in Baltimore to the defendants, and receipted for to said company by the defendant, R. Snowden Andrews, in person, and that said stock was never delivered to the plaintiff; but by the permission of the defendants went into the possession of said Palmer, and was by him sold to Knapp and Griffin, at the several times in November, 1885, as stated by said Knapp and Griffin, and the proceeds appropriated by said Palmer to his own use ; and

that thereafter on the 18th day of December, 1885, the said Palmer, while still in the employ of the defendants, or if previously discharged by the defendants in the said month of December, as claimed by them, no notice of such discharge had been given by the defendants to the plaintiff, and such discharge was unknown to the plaintiff, delivered to the plaintiff under the circumstances testified to by the plaintiff, the four certificates produced at the trial, purporting to be each for 100 shares of the stock of said New York, Lake Erie and Western Railroad Company, being those admitted by the written admission of counsel to have been raised from genuine certificates of one share each to certificates for 100 shares each, and that said certificates were delivered by said Palmer on behalf of said defendants, and accepted by the plaintiff as the shares purchased for the plaintiff by the defendants, and which had not been theretofore delivered to the plaintiff, and that the plaintiff did not know, and had no reason to suspect, that the said certificates were not genuine certificates for 100 shares each until the discovery of their real character was made in New York on June 10, 1886, under the circumstances shown in the evidence of the plaintiff and of the defendant, R. Snowden Andrews, and his son, Charles L. Andrews, and that upon such discovery the plaintiff upon the 11th day of June, 1886, made of the defendants the demand testified to by W. S. Gephart, Esq., then the plaintiff is entitled to recover the value of four hundred shares of the common stock of the said New York, Lake Erie and Western Railroad Company.

2. If the Court shall find the facts set forth in the plaintiff's first prayer as to the partnership and business of the defendants, and their course and mode of dealing and the course and mode of dealing between the defendants and the plaintiff, and the relation to the business of

the defendants of Nelson Palmer, and his relation to the business between the plaintiff and defendants, and shall further find that the same continued during the time of the occurrences hereinafter stated, and that the defendants purchased in New York, for the plaintiff, 100 shares of the stock of the Missouri, Kansas and Texas Railroad Company in pursuance of an order for this purpose given by the plaintiff to the Baltimore house and transmitted by it ; and that said stock having been paid for by the plaintiff, was, on the 5th day of October, 1885, sent by Adams Express Company from the New York house in a package addressed to the Baltimore house, for delivery to the plaintiff ; and that said stock was by said express company on the 6th day of October, 1885, delivered to the said Baltimore house and receipted for to said company in the name of Andrews, Peters & Company by said Nelson Palmer, and that said stock was never delivered to the plaintiff, but was sold by the said Palmer on the 6th day of October to E. N. Morrison, as testified to by him, and the proceeds appropriated by said Palmer to his own use ; and that thereafter, on the 18th day of December, 1885, the said Palmer, while still in the employ of the defendants, or if previously discharged by the defendants in said month of December, as claimed by them, no notice of such discharge had been given by the defendants to the plaintiff, and such discharge was unknown to the plaintiff, under the circumstances testified to by the plaintiff, the three certificates produced at the trial, purporting to be each for 100 shares of the stock of said Missouri, Kansas and Texas Railroad, being those admitted by the written admission of counsel to have been raised from genuine certificates for one share each to certificates for 100 shares each, and that said shares were delivered by said Palmer on behalf of the defendants, and accepted by the plaintiff as shares of said stock which had been purchased by the defendants for the

plaintiff, and among such shares so as aforesaid purchased and paid for as above mentioned, and not theretofore delivered to the plaintiff, and that the plaintiff did not know, and had no reason to suspect, that said certificates were not genuine certificates for 100 shares each, until the discovery of their real character was made in New York on June 10, 1886, under the circumstances shown in the evidence of the plaintiff, and of the defendant Andrews, and his son, Charles L. Andrews, and that upon such discovery the plaintiff, upon the 11th day of June, 1886, made of the defendants the demand testified to by W. S. Gephart, Esq., then the plaintiff is entitled to recover the value of 100 shares of the said stock of the said railroad company.

3. If the Court shall find a verdict for the plaintiff, then the value of the stock of the New York, Lake Erie and Western Railroad Company, therein mentioned, is to be ascertained as of the 4th day of November, 1885.

4. If the Court shall find a verdict for the plaintiff under the first prayer of the plaintiff, then the value of the stock of the New York, Lake Erie and Western Railroad Company, therein mentioned, is to be ascertained as of the 11th of June, 1886.

5. If the Court shall find a verdict for the plaintiff under the plaintiff's second prayer, then the value of the stock of the Missouri, Kansas and Texas Railway Company is to be ascertained as of the 5th day of October, 1885.

6. If the Court shall find a verdict for the plaintiff under the plaintiff's second prayer, then the value of the stock of the Missouri, Kansas and Texas Railway Company is to be ascertained as of the 11th of June, 1886.

7. If the Court shall find the facts set out in the plaintiff's first and second prayers, and that the plaintiff gave to Nelson Palmer on the 18th day of December, 1885, his check of that date, offered in evidence, and re-

Andrews, *et al. vs.* Clark.

ceived from said Palmer the receipt of the same date, offered in evidence, and that said check was given, and said receipt given, under the circumstances testified to by the plaintiff ; and shall further find that the four hundred shares of Erie stock, shown by the defendants to have been purchased for the plaintiff, and sent from New York on November 4, 1885, and the one hundred shares of the Missouri, Kansas and Texas stock, shown by the defendants to have been purchased for the plaintiff, and sent from New York on October 5, 1885, had never been delivered to the plaintiff, but had been fully paid for by the plaintiff prior to December 18, 1885, and that all other stock of the Missouri, Kansas and Texas R. R. theretofore purchased by the defendants for the plaintiff had been sold by the defendants for the plaintiff, and accounted for by them to him, and that the plaintiff, at the time of said settlement with said Palmer, on the 18th day of December, 1885, did not in fact owe to the defendants any money on any account, but that the plaintiff, relying upon the assertions then made to him by said Palmer, paid said $4138.31 in the belief that he was indebted in said amount to the defendants for a balance due by him, as stated to him by said Palmer, and without any knowledge that said Palmer had been discharged from their employ by defendants, and in he *had* been there discharged; and shall further find that the said Palmer having endorsed the said check for $4138.31, in the name of Andrews, Peters and Company, deposited it on December 19, 1885, to the credit of said firm in their account with Robert Garrett & Sons, as shown in the evidence, and that said check was duly paid by the bank on which it was drawn, and that said sum was on the books of said firm, as kept in Baltimore by T. S. Rhett, carried on said December 19th, 1885, to the credit of the account of E. N. Morrison, and carried to the credit of his account on the books

of said firm in New York, and appropriated by said firm to the payment of stocks purchased by them on the 17th and 19th days of December, 1885, for said Morrison, and that said purchase of said stocks had never been authorized by said Morison, but that the purchase of the same had been made by defendants in New York on orders sent to them from the Baltimore house of the firm by said Palmer, and that said stocks were sent to and received by said Baltimore house from the New York house on the 21st and 22d of December, 1885, and never delivered to said Morison, but that said Palmer was allowed by said defendants to take possession of the same, and having so obtained possession of the same, sold them and appropriated the money received from said sale to his own use, as shown in the evidence of Weaver and the statement of Messrs. Knapp & Griffin, then the plaintiff is entitled to recover the said sum of $4138.31 in this action, with interest in the discretion of the Court.

8. If the Court shall find from the evidence of the facts set forth in the plaintiff's first prayer, as to the partnership and business of the defendants, and their course and mode of dealing, and the course and mode of dealing between the defendants and the plaintiff, and the relations to the business of the defendants of Nelson Palmer, and his relation to the business between the plaintiff and the defendants, and shall further find that the same continued during the time of the occurrences hereinafter stated, at least up to the time in December, 1885, at which defendants claim to have discharged said Palmer, and that on the 4th day of June, 1885, the defendants purchased in New York, for the plaintiff, 200 shares of the stock of the Chicago, Milwaukee and Saint Paul R. R. Company, commonly called Saint Paul stock, in pursuance of an order for this purpose, given by the plaintiff to the defendants' house in Baltimore, and by it transmitted, and that said stock was on the 12th day

of June, 1885, sent by Adams Express Company, from the New York house, in a package, addressed to the Baltimore house, for delivery to the plaintiff, and that said stock was, by said express company, on the 13th day of June, 1885, delivered to the said Baltimore house, and receipted for to said company in the name of Andrews, Peters and Company, by said Nelson Palmer, and that said stock was never delivered to the plaintiff, but was, by said Palmer, taken into his possession, and on the 13th day of June, 1885, delivered to E. N. Morrison, who advanced the sum of $13,300 to said Palmer, and a check given to him by said Morrison, on the said 13th day of June, 1885, which was by him deposited in the Franklin Bank, and to his credit, and that he thereupon drew his check on said Franklin Bank for $13,364.73, and deposited the same in the banking house of Robert Garrett & Sons, to the credit of Andrews, Peters and Company, and the said amount credited to the account of the plaintiff, as of June 13, 1885, on the cash book of the defendants, as kept in Baltimore, by T. S. Rhett, and also on the books of defendants, as kept in New York; and that said Morrison, on the 16th and 20th of June, 1885, sold said stock for $13,900, and accounted with said Palmer therefor, and that all of the transactions of said Palmer in respect to said stock on its receipt in Baltimore, were without any knowledge on the part of the plaintiff, and did not come to his knowledge either until they were stated in his presence by said Palmer on June 11, 1886, as testified to by the witness, Charles L. Andrews, or until the trial of this case, as testified to by the plaintiff himself. And that the said Palmer on or about June 13, 1885, delivered to the plaintiff an envelope, which he told the plaintiff contained the 200 shares of the Saint Paul stock, and that the plaintiff, relying upon the truth of the said assertion, did not open said envelope, but placed it at once in his box in the Safe

Deposit Company, and that it there remained until it was taken out by the plaintiff in March, 1886, and delivered to the defendant Andrews to be taken to New York for the purposes mentioned by the plaintiff, and that the plaintiff did not then examine the said package, but supposed it to contain the Saint Paul stock, and was not aware that it did not until the envelope was returned from New York by said Andrews, when the plaintiff ascertained that instead of the 200 shares of Saint Paul stock there were in said envelope 200 shares of stock known as St. Paul and Omaha stock; and shall further find that said latter stock had been purchased for the plaintiff by the defendants in June, 1885, without his knowledge, and sent to Baltimore for delivery to him, and received on June 8, 1885, on behalf of the Baltimore house of the defendants from Adams Express Company, and receipted for in the name of said house by Nelson Palmer; and that when said package was delivered by said Andrews to the plaintiff on the return of the former from New York, the plaintiff was directed, as testified by him, to look to Palmer in reference to said matter, and that thereupon there was done in reference to said Saint Paul stock, and the Saint Paul and Omaha stock, what the plaintiff testified was done, and that upon the receipt by the plaintiff from said Palmer of the two certificates offered in evidence in this case, purporting to be each for 100 shares of the said Saint Paul stock, being those admitted by the written admission of facts signed by counsel to have been raised from genuine certificates of one share each to certificates of 100 shares each, the plaintiff placed the same in his box in the Safe Deposit Company, where they remained until taken to New York in June, 1886, as testified to by the plaintiff; and that the plaintiff did not know, and had no reason to suspect, that the said certificates were not genuine certificates for 100 shares each, until the discovery of

their real character in New York on June 10, 1886, under the circumstances shown in the evidence in this case; and that upon such discovery the plaintiff upon the 11th day of June, 1886, made of the defendants the demand testified to by W. J. Gephart, Esquire, and that when the package, purporting to contain the 200 shares of Saint Paul stock was delivered to the plaintiff by Palmer in June, 1885, the plaintiff supposed that the said stock had been paid for by moneys belonging to him in the hands of the defendants, and that the course of dealing between the plaintiff and defendants was that securities were never delivered by the plaintiff to the defendants until paid for by him, then the plaintiff is entitled to receive the excess, if any, of the price of 200 shares of Saint Paul stock, on the 11th day of June, 1886, over what said price was at the time of its purchase by defendants for plaintiff in June, 1885.

The defendants offered the following eleven prayers :

1. The defendants pray the Court to rule as law in this case, that if the Court, as a jury, shall find that in order to entitle the plaintiff to the delivery of the 200 shares of the Saint Paul stock, purchased for him by the defendants on the 4th day of June, 1885, the plaintiff was bound to pay the defendants the sum of $13,364.73; and if the Court further find as a fact that the said amount was paid by Palmer out of the proceeds of the sale of the same Saint Paul stock, as shown in the evidence, and was not paid by the plaintiff, then if the plaintiff does not recognize and adopt the act of Palmer in making said payment, the said plaintiff is not entitled to recover for said Saint Paul stock, except, if at all, to the extent the Court may find that the same was paid for by money of the plaintiff, nor is the plaintiff in that case entitled to recover for said Saint Paul stock, even as to the part so paid for with his own money, provided the Court shall find the facts stated in the defend-

ants' second prayer ; and if said plaintiff adopts as his own act the act of said Palmer, and claims the benefit of said payment now, knowing how the same was made, then the plaintiff thereby ratifies the sale of said Saint Paul stock by Palmer, and is not entitled to recover for the non-delivery thereof in this suit.

2. If during the business transactions between the plaintiff and defendants, the latter were accustomed to furnish monthly statements of the accounts between them to the plaintiff, showing the purchases and sales made for him in each month, and showing the securities delivered to him and received from him each month, and the securities held for plaintiff by defendants at the end of each month and the beginning of the next month, and showing also the money payments made to or received from the plaintiff, and the money balances between the plaintiff and the defendants at the end of each month and the beginning of the next month ; and if said statements were rendered for the purpose of notifying the plaintiff of the state of his accounts with the defendants, and for verification by him ; and if the plaintiff received the account dated June 1, 1885, produced by him, showing that defendants then held for him 400 shares of Erie stock and 200 shares of Texas Pacific stock, against which there were no charges or debit, and that they had to the credit of the plaintiff on the first of June, 1885, $36,085.18 in money, applicable to the purchase of any securities the plaintiff might make ; and if on the 4th of June the defendants purchased, by order of plaintiff, 200 shares of Saint Paul stock, costing $13,500, and the 11th and 12th of June purchased, by order of plaintiff, 200 shares of Erie stock, costing $3000 ; and if during that month the plaintiff ordered all the stocks in hand June 1, and the Saint Paul and Erie purchased as aforesaid, to be delivered to him ; and if the plaintiff knew that he was not entitled to

have and could not have delivery of the stocks as called
for by him, unless the same were paid for ; and if the
plaintiff did not, during the month of June, pay the de-
fendants any money or sell any stocks from which the
defendants received or could receive money for his ac-
count ; and if the plaintiff received the monthly state-
ment dated July 1, 1885, showing that he was not
charged with anything as remaining due and unpaid on
account of the St. Paul and Erie stock purchased for
him during the month of June, and that the same had
been paid for in same way, and that defendants did not
charge themselves with any of the stocks held by them
for him on the first of June, as shown by the account
of that date, or with the Saint Paul and Erie stock pur-
chased for him in June, as still on hand on the first of
July, 1885 ; and if the plaintiff actually received in
June, the stocks held for him on the first of June, and
the Erie stock purchased for him in June ; and if de-
fendants sent the 200 shares of Saint Paul stock to Bal-
timore for delivery to plaintiff, and the said defendants
employed Nelson Palmer, their agent, to deliver said
stock to plaintiff in the usual way of business of said
defendants, and of the employment of said Palmer ; and
if said plaintiff received a package from said Palmer,
which said Palmer represented to contain Saint Paul
stock, and which plaintiff received, believing the same
to contain said stock, then the defendants pray the Court
to rule, as matter of law, that it was the duty of the
plaintiff in a reasonable time to examine the contents of
said package, and to inquire how the said stocks pur-
chased for him in June for an amount exceeding the
money to his credit with the defendants by about $9000
had been paid for, so as to entitle him to receive the
same, and his failure to make said examination and to
institute said inquiry was a breach of that duty on the
part of the plaintiff ; and if a mere inspection of the

contents of said package would have shown that it contained no Saint Paul stock, and if an inquiry by plaintiff as to how said stocks so delivered, and so believed to be delivered to the plaintiff, had been paid for, would have led to the discovery of the fraud perpetrated by said Palmer with reference to said Saint Paul stock, as shown in evidence ; and if the plaintiff did not examine said package, and did not inquire how said stock had been paid.for, and the said fraud of said Palmer was in consequence of the default and neglect of plaintiff was concealed and not discovered until March or April of 1886, as shown in evidence; and if the defendants, by reason of and by the direct effect of said neglect of the plaintiff, had no notice of the fraud of said Palmer, or that plaintiff had not received said Saint Paul stock, and thereby lost the opportunity to proceed promptly against said Palmer to protect themselves against the consequences of his fraud, the plaintiff is not entitled in this action to recover for the non-delivery to him of any part of said Saint Paul stock that the Court may find to have been paid for with the money of the plaintiff ; provided the Court shall find that the defendants did not by their own negligence enable said Palmer to perpetrate said fraud, but were ignorant and innocent of the same.

3. If the Court finds the facts set forth in defendants' second prayer, and if the defendants purchased for the plaintiff 100 shares of M., K. and T. stock on the first of September, 1885, and said purchase appeared in the statement, dated October 1, furnished to plaintiff, and produced by him; and if the plaintiff requested the delivery of said 100 shares, and the same were sent from New York to the Baltimore house for delivery to the plaintiff, on or about October 5, 1885, and received by Nelson Palmer for delivery to the plaintiff in the regular course of business of the defendants and of the employ-

ment of said Palmer; and if said Palmer, without the knowledge of the defendants, failed to deliver said shares to the plaintiff, and the latter renewed his request for the delivery of the same to said Palmer, and was satisfied with excuses made by said Palmer for the delay in the delivery of said shares, and did not inform the defendants, and the defendants were in fact ignorant that there had been such failure to deliver said shares, and that Palmer had so excused the non-delivery thereof to the plaintiff; and if the defendants also purchased for the plaintiff 200 other shares of said M., K. and T. stock on the 20th of October, 1885, and if the defendants also had on hand for the plaintiff on the 4th of November, 1885, 400 shares of the Erie stock purchased for him, as shown in the accounts of November 1st and December 1st, offered in evidence; and if the plaintiff about or before the 4th of November demanded the delivery of said Erie stock and of said M., K. and T. stock, and the Erie stock was sent on or about the 4th of November, from New York to the Baltimore house, for delivery to the plaintiff, and Nelson Palmer was entrusted with the same to be delivered to the plaintiff, in the usual course of defendants' business, and of the employment of said Nelson Palmer, and if said Palmer, without the knowledge of the defendants, failed to deliver said stocks to the plaintiff, and the latter repeated his demand for the same to the said Palmer, and received excuses from said Palmer for said non-delivery, with which said plaintiff was satisfied, and did not inform the defendants of said delay, and if said conduct of said Palmer, and defendants were in fact ignorant thereof, and if Palmer had no authority from the defendants, with reference to said stocks, Erie and M., K. and T., except to deliver the same to the plaintiff immediately, and there was in fact no reason or excuse for the non-delivery of the same, and the plaintiff had no right to suppose from any conduct

of the defendants, that Palmer was authorized to delay the delivery of stocks when ordered to be delivered by plaintiff, or to excuse such non-delivery, and nevertheless accepted the excuses of said Palmer, and acquiesced in said delay; and if, on or about the first of December, 1885, the plaintiff discovered the abstraction by said Palmer of the United States bond mentioned in evidence, and did not make it known to the defendants until he told T. S. Rhett, as hereafter stated, in order to shield said Palmer from the consequences of his conduct; and if several days before the 18th of December, the plaintiff requested Rhett, the clerk and book-keeper of defendants, to explain the monthly statements of defendants, rendered plaintiff, and said Rhett then discovered, and pointed out to plaintiff, that the statements dated November 1st and December 1st, in possession of plaintiff, were spurious statements, and that they were made out by Palmer in imitation of the genuine statements, and that Palmer had no right to make any statements for defendants, and that all statements of defendants were made out in New York, and were in the form and handwriting of the other statements there in the possession of the plaintiff; and also called attention of the plaintiff to the attempt made by said Palmer to imitate the hand-writing of the person who made the genuine statements, and if plaintiff then informed Rhett of the bond incident mentioned in evidence; and if the plaintiff requested Rhett to obtain for him duplicates of the statements of November 1st and December 1st, and Rhett obtained the same and brought them to the plaintiff on the following day, and left them with the plaintiff several days before December 18th, and explained to him the difference between the duplicates and the spurious statements; and if Rhett, on the day he delivered the spurious statements, and learned of the U. S. bond incident, repeated the same to Andrews, one of the de-

fendants, and that Andrews forthwith discharged said Palmer from the service of the defendants; and if three or four days afterwards, on the 18th day of December, said Rhett took to the plaintiff the statement of December 17th, produced by plaintiff, the same having been asked for by plaintiff because he wanted to close his business in stocks, and had the settlement with the plaintiff shown in evidence, and delivered to plaintiff the 500 shares of Texas Pacific stock shown by said statement to be on hand, and received from plaintiff the balance due by him shown by said statement, and the receipt of that date offered in evidence; and if the statements then in possession of plaintiff, including the duplicates of November 1st and December 1st, so left with him by said Rhett, showed on their face that the balance of $1194.47, shown by the statement of December 17th, was the entire balance due the defendants on all transactions between them and plaintiff to the date of said statement, including said 400 shares of Erie stock and said 100 shares of M., K. and T. stock, hereinbefore mentioned, whether said Erie and M., K. and T. stocks had been actually received by the defendants or not, and if an examination of said statements would have shown the plaintiff that defendants claimed that they had sold 200 shares of his M., K. and T. stock, and had delivered the other 100 shares to plaintiff, and had none of that stock on hand on the 17th day of December, and that they claimed to have delivered the 400 shares of Erie on the 14th of November, but that in no case did they claim that plaintiff owed them on account of all transactions between them more than the money balance shown by the statement of December 17th, and paid to said Rhett; and if soon after the settlement between plaintiff and Rhett, Palmer came to the place of business of the plaintiff, and then and there proceeded to make out a statement of the account of the plaintiff with

the defendants wholly unlike in form and substance the account rendered by defendants to plaintiff, then in his possession as aforesaid, said statement so made by said Palmer having the effect of undoing in part what had shortly before been settled between plaintiff and Rhett, and containing items not shown to be proper items in any account between plaintiff and defendants, and containing items which were shown to be false by the accounts furnished plaintiff by defendants, and showing the plaintiff to be indebted to the defendants to the amount of $4378.31 on account of said Erie and M., K. and T. stocks, or either of them, over and above the balance claimed by the defendants in their true accounts rendered the plaintiff; and if an examination of the accounts in the possession of the plaintiff received from defendants would readily have disclosed all these facts to the plaintiff, and if said settlement was the first and only one of the kind the plaintiff had ever had, with said Palmer; and he then and there demanded of the plaintiff the payment of the sum of $4378.31, as due on account of said M., K. and T. and Erie stocks, or either of them, and as being payable in order to receive said stocks, or either of them, and if said Palmer had no authority in fact to make such a settlement, and the same was different in the particulars above mentioned from any transactions that plaintiff had ever had with said Palmer as agent of the defendant, and from the accounts rendered by defendants then in plaintiff's hands; and if the plaintiff, notwithstanding the above facts, made the settlement with said Palmer mentioned in evidence, and gave him the check for $4378.31, and received from him the fraudulent stocks mentioned in evidence, the defendants pray the Court to rule as a matter of law on the foregoing hypothesis of facts that it was the duty of the plaintiff to have made known to the defendants the delay in the delivery of his stocks as hereinbefore set forth when

said delivery occurred, and it was the duty of the plaintiff to inquire of the defendants why he was required to pay $4378.31 to obtain a delivery of his stock, as shown by the statement of Palmer, when the defendants' accounts rendered show that they had been paid in full for all said stocks, and it was the duty of the plaintiff to inquire as to the authority of said Palmer to make said settlement; and the failure of the plaintiff to make such inquiries under the circumstances above set forth within a reasonable time after the plaintiff had the said accounts in his hands, and had an opportunity to see that the statement made by Palmer, showing said balance to be due by plaintiff, was in direct conflict with the statements furnished to plaintiff by defendants, or as a breach of legal duty he owed to the defendants under the circumstances above set forth, and warrants the Court in finding that there was negligence on the part of the plaintiff; and if the Court so finds, and if the Court shall find that had the plaintiff informed the defendants of the delay in the delivery of said stock, and the excuses made by said Palmer for not delivering the same when required, or shall find that an inquiry by the plaintiff as to the authority of said Palmer to make said settlement of December 18th, or an inquiry as to the terms of said settlement by the plaintiff to the defendants would have resulted in the immediate discovery of the fraud perpetrated by said Palmer on the plaintiff with reference to said Erie and M., K. and T. stocks, as shown in evidence; and if the plaintiff neglected his duty, as above set forth, and in consequence of his said failure to perform his duty in the premises, and that the direct consequence of the unauthorized settlement made by the plaintiff with Palmer was to keep from the defendants all knowledge or notice of the non-delivery to the plaintiff of the M., K. and T. stock, above mentioned, and they were thus prevented from obtaining knowledge of

the fraud of said Palmer until the fraud of said Palmer was discovered in June, 1886, as shown in evidence, or from obtaining knowledge the plaintiff had not received said stocks, and that by reason of the conduct of the plaintiff the defendants lost the opportunity to take measures promptly against said Palmer to protect themselves against the consequences of said fraud of said Palmer during all the time the knowledge of said fraud was so concealed from them, the plaintiff is not entitled to recover in this action for non-delivery of said 400 Erie stock or said 100 M., K. and T. stock, or any part thereof, provided the Court shall find that the abstraction of said stocks by said Palmer, as shown in evidence, was not effected through the negligence of the defendants.

4. If the Court shall find that the defendants entrusted Nelson Palmer, their agent, with the delivery to the plaintiff of 100 shares of M., K. and T. stock in controversy in this case, in the usual way of business of the defendants, and of the duty of said Palmer as their agent, and in the usual way of the dealings of the defendants with the plaintiff, the defendants then having no cause to suspect the honesty and fidelity of said Palmer ; and if the defendants in like manner entrusted said Palmer with the delivery of the 400 shares of Erie stock in controversy to the plaintiff, having then no reason to suspect the honesty and fidelity of said Palmer; and if the duty of said Palmer with reference to said stocks, in the usual course of his employment, as agent of the defendants, was to deliver the same to plaintiff forthwith, and if the defendants had never authorized said Palmer to delay the delivery of stocks so entrusted to him, or to excuse such non-delivery, and had never given the plaintiff any reason to believe that Palmer had such authority, and the plaintiff nevertheless made several demands on said Palmer for his stocks, and accepted as satisfac-

tory excuses for the delay in delivery made by said Palmer, which were false, and acquiesced in the delay, as testified to by plaintiff, and did not inform the defendants of the facts; and if said Palmer fraudulently retained said stocks, and converted the same in the manner shown in evidence, and if said defendants were entirely innocent and ignorant, in point of fact, of the fraud of said Palmer, in so retaining and converting said stocks, and derived no profit or advantage therefrom, and acting throughout in good faith ; and if the course of conduct pursued by defendants towards the plaintiff in their dealings with him, with reference to said stocks, was such that the frauds of said Palmer would necessarily have been discovered on the 18th of December, 1885, or immediately thereafter, had not the plaintiff, without the knowledge of or notice to the defendants, made the settlement with said Palmer on that day, and as part of said settlement received from said Palmer the forged certificates of stock shown in evidence ; and if said settlement between the plaintiff and Palmer, on the 18th of December, be found to have been unauthorized by the defendants, and known to the plaintiff at the time to be unauthorized, or that plaintiff, by the reasonable use of the information, with which the statements then in his possession, as set forth in defendants' third prayer, could easily have known that the settlement so made by said Palmer, and the demand so made by him on the basis of said settlement of the sum of $4378.31 as being payable by the plaintiff to obtain delivery of said stocks, was not only not authorized by defendants, but was in direct conflict with their authorized statements to plaintiff as set forth in the third prayer of the defendants, and if within a few days after the settlement between plaintiff and Palmer the plaintiff permitted Palmer to abstract the accounts which would have proved the fraud of Palmer; and if the immediate and direct consequences of said unauthorized settlement

of the plaintiff with Palmer was to conceal the fraud of said Palmer with reference to said stocks, and to prevent the same from being brought to light on the 18th of December, or immediately after that day, as the result of the course of conduct pursued by the defendants towards the plaintiff with reference to said stocks, and if the immediate and direct consequence of the said unauthorized acts of the plaintiff in making said settlement with said Palmer, and in acquiescing in the delay of said Palmer in delivering the same, as above set forth, was to defeat and prevent the discovery of said frauds of said Palmer with reference to said stocks, and to defeat the precautions taken by the defendants in their dealings with the plaintiff in regard to said stocks; and if, in consequence of said unauthorized acts of the plaintiff, the discovery and detection of the frauds of said Palmer were prevented for nearly six months ; and if, in consequence of the said unauthorized acts of the plaintiff, the defendants were deprived of the opportunity to take measures to protect themselves against the consequences of said frauds of said Palmer, for the time during which said frauds were so concealed by the said unauthorized acts of plaintiff, then the plaintiff must be held in law to have contributed actively to aid said Palmer in concealing his said frauds, and in preventing the defendants from protecting themselves against the consequences of the same, with the like legal effects upon the rights of the defendants that voluntary collusion with Palmer by plaintiff would cause. And if the Court finds the facts set forth in the foregoing hypothesis, the plaintiff is not entitled to recover in this action on account of the non-delivery of said stocks, even if the Court shall find as a fact the defendants might have taken other precautions than those taken by them to prevent the frauds of said Palmer. And the defendants pray the Court to rule as matter of law that there is no evidence in this case legally sufficient to warrant the

Andrews, *et al. vs.* Clark.

Court to find as matter of fact that Palmer had any authority to make the settlement with the plaintiff that was made between them on the 18th of December, 1885, or that the plaintiff had any right or reason to believe that said Palmer had authority to make said settlement.

5. If the Court shall find that the settlement between Clark and Palmer, on the 18th of December, 1885, was made as set forth in the defendants' third and fourth prayers, and that Palmer had no authority to make the same, and that Clark had no reason to believe that Palmer had such authority, and that Clark, in fact, had notice from his previous dealings with the defendants, and from the accounts rendered him by the defendants, and from what had taken place between Clark and Rhett shortly before, and on the 18th of December, 1885, before said settlement with Palmer, that said Palmer in point of fact was without authority to make said settlement, and was not authorized to demand or receive from said Clark the check for $4378.31, as shown in the evidence of said Clark, to entitle said Clark to the delivery of any stock of his in the hands of defendants, or that plaintiff might have known by a reasonable use of the information with which defendants had furnished him, that Palmer had no such authority, then the said Clark must be taken to have given said check to said Palmer at the peril of said Clark, and the defendants were under no obligation to take any precautions against the use of said check by said Palmer, and were guilty of negligence as against plaintiff if they failed to take such precautions, are not liable to said Clark for the use made by said Palmer of the same, or for amount of said check, unless the fact that said Clark had given said check to said Palmer came to the knowledge of the defendants, or they had some notice thereof sufficient to put a man of ordinary prudence on inquiry in time to have enabled him to prevent the fraudulent use of it by said Palmer,

or unless the defendants at the time they credited the account of Morrison with the sum of $——, deposited with Robert Garrett & Sons on the 19th of December, 1885, and delivered the securities mentioned in the receipts of said Morrison, signed by his clerk, in consequence of and in consideration of said credit, knew or had reason to suspect, that said credit consisted in part of the check so given by the plaintiff to Palmer on the 18th of December, provided the Court shall find that the defendants acted in good faith in the matter, and delivered the said securities in good faith on the receipts of Morrison offered in evidence, on the faith of the credit so given Morrison, and were by means of said credit prevented from taking any measures to enforce payment of the balance appearing due on the account of said Morrison.

6. That as matter of law there is no evidence in this case legally sufficient to warrant the Court in finding as a fact that the plaintiff did not contribute to aid in concealing the frauds of Nelson Palmer from the defendants in the manner set forth in the defendants' fourth prayer, inasmuch as the whole evidence as to the settlement between plaintiff and Palmer, referred to in that prayer, is the testimony of the plaintiff himself, as well as all the evidence as to the acquiescence of the plaintiff in the failure of Palmer to deliver the stocks therein mentioned, and his acceptance of the excuses of said Palmer, as set forth in said prayer.

7. That as matter of law, there is no evidence legally sufficient to warrant the Court in finding as matter of fact that the defendants had any notice that the plaintiff had had the transaction with Palmer on the 18th of December, or that plaintiff had given Palmer the check for $4378.31, or that the defendants were guilty of any negligence in discharging their duty to the plaintiff with reference to said check.

8. That as matter of law, there is no evidence in the case legally sufficient to warrant the Court in finding that Nelson Palmer was enabled to perpetrate the fraud committed by him with reference to the Saint Paul stocks mentioned in the defendants' first and second prayers, through or by means of the negligence of the defendants.

9. That as matter of law, there is no evidence in the case legally sufficient to warrant the Court in finding that Nelson Palmer was enabled to perpetrate the fraud committed by him with reference to the M., K. and T. stocks, and the Erie stocks, mentioned in defendants' third prayer, through or by reason of the negligence of the defendants.

10. That if the defendants were bound on the demand of the plaintiff to deliver promptly to him such stocks as they had purchased for him, and which he had paid for, and plaintiff was aware of this obligation upon their part, and if plaintiff demanded the delivery of the M., K. and T. stock in controversy, about the 5th of October, 1885, and demanded the delivery of the 400 Erie stock in controversy about the 4th of November, 1885; and if defendants immediately sent said stocks to Baltimore, and entrusted them to Nelson Palmer, their clerk, to be delivered to the plaintiff in the usual way of business, and of the employment of said Palmer; and if the duty of said Palmer in reference to said stocks, was to deliver the same to the plaintiff promptly, and said Palmer had no other authority with reference to them; and if the plaintiff, after requiring said stocks to be delivered, applied to said Palmer for them more than once, and said Palmer made excuses for the delay in complying with the demand of the plaintiff, which proved afterwards to be false, and promised delivery from time to time, and did not deliver said stocks; and if plaintiff accepted the excuses of said Palmer for said delivery and

non-delivery, and relied on said promises as satisfactory, and acquiesced in said delay, as testified to by plaintiff, and if the defendants were not informed of these facts, and if Palmer had no authority to delay the delivery of stocks so called for by plaintiff, and had no authority to excuse the delay in delivering the same, or to make said promises, and if plaintiff had no reason to suppose, from any dealings between him and the defendants, that Palmer was unauthorized to ask for time for the delivery of stocks after plaintiff had called for them, or to give excuses for their failure to deliver the same promptly, or to make said promises, then the plaintiff, by such unauthorized dealings with said Palmer, and by failing to inform the defendants thereof, assumed the risk of the consequences of such unauthorized dealings between the plaintiff and Palmer, and the matter of the delivery of said stocks thenceforth became a matter between the plaintiff and Palmer, and the defendants were relieved from further responsibility in that behalf.

11. If the Court finds that the facts as to the authority of said Palmer, and the knowledge of the plaintiff as to its extent, were as set forth in the preceding prayers touching the matters therein stated, and that the facts therein stated, with reference to the stocks therein mentioned, were as therein stated, and that the dealings of the plaintiff with the defendants, and with said Palmer, were as therein stated, and that the direct effect of said conduct of the plaintiff, was to enable said Palmer to perpetrate and to conceal the frauds committed by him with reference to said stocks, to the prejudice and injury of the defendants, the plaintiff is not entitled to recover in this action on account of said stocks, or the loss of them.

The Court (DUFFY J.,) granted the first, second, fourth, sixth and seventh prayers of the plaintiff, and rejected his third, fifth and eighth prayers, and rejected

all the prayers of the defendants. The defendants excepted, and the verdict and judgment being against them, they took this appeal.

The cause was argued before ALVEY, C. J., IRVING, BRYAN, and McSHERRY, J.

*Richard S. Culbreth,* and *Charles Marshall,* for the appellants.

*W. Starr Gephart,* and *Bernard Carter,* for the appellee.

ALVEY, C. J., delivered the opinion of the Court.

In this case the action was brought by the appellee against the appellants for the non-delivery of certain railroad stocks purchased by the defendants for the plaintiff ; and for money paid by the plaintiff to the use of the defendants, by the fraudulent procurement of the alleged agent of the defendants, and by the mistake of the plaintiff.

The defendants are stock brokers, and while their principal house and place of business is in the City of New York, they have a branch house in the City of Baltimore, and the business is conducted in New York in the firm name of Peters, Schenck & Co., and in Baltimore as Andrews, Peters & Co., Andrews being the resident manager of the branch house in Baltimore. The firm are not members of the Stock Exchange in the City of Baltimore, but all their stock transactions are conducted through the Stock Exchange of the City of New York. Hence, orders given for the sale or purchase of stock by a customer in Baltimore is executed by the house in New York, the two houses being connected by private wire ; but stocks or bonds are received and delivered by the house in Baltimore and accounts are rendered and settled there with the customers dealing with the branch house.

The plaintiff, an old and long established dealer in jewelry and silver ware in the City of Baltimore, became a customer of the branch house of the defendants, and dealt in stocks and other securities quite extensively from some time in May, 1884, to the end of the year 1885. During that period there were many purchases and sales for and on account of the plaintiff; and it seems to have been the regular course of dealing and method of conducting the business, that where accounts were active, that is to say, where debits and credits were frequent, the house furnished to the customer monthly statements of account, made up in New York and furnished to the Baltimore house for delivery, showing the state of the dealing, and the balances the one way or the other. These monthly statements were furnished for and delivered to the plaintiff, though with some irregularity during the latter part of the dealing. From the time of the commencement of the dealings between the plaintiff and the defendants to about the middle of December, 1885, the latter had in their employ a person by the name of Palmer, who was largely entrusted with the business of the branch house, and with whom most of the dealings of the plaintiff were transacted. It was out of the dealings with this agent that the present litigation has sprung,—the agent having perpetrated gross frauds in the course of that dealing. And the general question here is, who is to bear the consequences of the infidelity and fraud of such agent?

The action was brought on the 15th of July, 1886 ; and it is in assumpsit on the common counts, with three special counts added ; the first of which special counts alleges that the defendants, in consideration of the sum of $18,000, to be paid to them by the plaintiff, agreed to purchase and deliver to the plaintiff, 200 shares of the common stock of the Chicago, Milwaukee and St. Paul

Railway Company ; and that the plaintiff paid to the defendants said purchase money, but the defendants have failed and refused to deliver the stock ; the second special count alleges that the defendants, in consideration of the sum of $8,000, to be paid to them by the plaintiff, agreed to purchase and deliver to the plaintiff, 400 shares of the stock of the New York, Lake Erie and Western Railroad Company ; and that the plaintiff paid to the defendants said purchase money, but the defendants have failed and refused to deliver the stock ; and the third special count alleges that the defendants, in consideration of the sum of $8,100, to be paid to them by the plaintiff, agreed to purchase and deliver to the plaintiff 300 shares of the stock of the Missouri, Kansas and Texas Railroad Company ; and that the plaintiff paid to the defendants said purchase money, but the defendants have failed and refused to deliver said stock. To this declaration the defendants pleaded, 1st, That they never were indebted as alleged ; and, 2nd, That they never promised as alleged.

The case was tried before the Judge, without the aid of a jury; and the Judge found, not a special verdict, but an itemized verdict in reference to the different subjects of claim, in this form :

"It disallows all claim of plaintiff for or in reference to the Chicago, Milwaukee and St. Paul Railroad Company stock, mentioned in the *narr.*, except as hereinafter mentioned.

" It allows the plaintiff for the value of 400 shares of New York, Lake Erie and Western Railroad Company stock, mentioned in the *narr.*, with interest thereon from 11th of June, 1886........................ . ............... .... $13,234 96

"It allows the plaintiff for the value of 100 shares of the Missouri, Kansas and Texas Railway Company stock, mentioned in the

Amount brought forward.......... ....$13,234 96
*narr.*, with interest thereon from 11th June,
1886........... ......... ......... ........................ ........ 3,286 72
"It allows the plaintiff for the amount of
the check for $4,378.31, given by him to de-
fendants on the 18th of December, 1885, with
interest from that date..... ..................... ........ 5,265 60
"It allows the plaintiff for the amount re-
ceived by defendants, and applied by them to
purchase of C., M. & St. Paul Railroad Com-
pany stock, being $125.37, with interest from
June 13, 1885...:...... .................. ......... ........166 81

$21,954 09
"Less dividend on last named stock, paid by
Palmer to plaintiff, on 30th of April, 1886,
being $500, with interest thereon from that
date......... ........ ......... ................................... . 590 33

$21,363 76"
And upon judgment being entered the defendants ap-
pealed.

There was a large mass of evidence produced, some of
which was conflicting as to material facts, and upon that
evidence each party offered prayers, some of which are
long enumerations of what were supposed to be the facts
established by the evidence, each side stating the facts
in their several prayers which were deemed essential to
the support of the particular hypotheses desired to be
maintained, and upon which the Court was asked to
affirm certain legal propositions as the result of the find-
ing of such facts. Some of the prayers offered by the
plaintiff were accepted and affirmed by the Court, as
furnishing correct rules to guide in considering and ap-
plying the facts of the case ; but all those offered by the
defendants were rejected.

It is very difficult, in a case presented as this is, where the trial Court has considered the whole case at large and drawn its conclusions, made up of mixed law and fact, to review the judgment with reference only to the legal propositions involved ; for while on a special verdict or a case stated there is no difficulty in applying the law that will control the facts thus ascertained, in a case like the present, where the whole evidence and the law have been considered together, in a concrete form, there is always danger of doing injustice both to the Court below and to the party in whose favor it decides, by disturbing the finding, for some supposed misconception or misapplication of the law. For while the finding of the facts is exclusively with the Court below, the law applied, or that should have been applied, is alone the subject of review in this Court. And therefore the very able discussions of the evidence, in the briefs of counsel in this case, avail nothing here, except as such review of the evidence may show the existence or non-existence of facts tending to support the hypotheses of the prayers granted or rejected by the Court.

Of the prayers offered by the plaintiff, those numbered one, two, four, six and seven were granted, the others being rejected. The first of the plaintiff's prayers relates to the New York, Lake Erie and Western Railroad Co. stock, mentioned in the second special count of the declaration, and in the verdict of the Court. The second prayer of the plaintiff, granted, relates to the Missouri, Kansas and Texas Railroad Co. stock, mentioned in the third special count of the declaration, and also in the verdict of the Court ; and the seventh prayer of the plaintiff, granted, relates to the check for $4,378.31, referred to in the verdict of the Court. The other granted prayers relate simply to the measure of damages.

Many of the most important facts of the case are undisputed, and about which therefore there is no conten-

tion. Among these are the facts that the stocks mentioned in the verdict of the Court, and for which allowances were made, were purchased by the defendants for the plaintiff, and were paid for by the plaintiff; that the stocks were duly received by the defendants in Baltimore to be delivered to the plaintiff, but that they never were in fact delivered to him : That instead of the genuine certificates of the stocks purchased and received by the defendants to be delivered to the plaintiff, raised or forged certificates were delivered to the plaintiff, at his place of business, on the 18th of December, 1885, by Palmer, professing to act for and in the name of the defendants, and at the same time claiming and receiving of the plaintiff the check for $4,378.31, as being the amount due the defendants from the plaintiff, for the stocks then professed to be delivered, when in fact there was nothing due from the plaintiff to the defendants whatever, as would appear from the statements of account then in the possession of the plaintiff. That some short time before December 18th, 1885, after repeated requests made by the plaintiff for the statement of his account with the defendants, Palmer furnished statements of the account dated respectively, November 1st and December 1st, 1885, which were afterwards and before the 18th of December, 1885, discovered to be false and simulated; and that upon such discovery, correct copies or duplicates of the monthly statements of the account, which had been furnished by the New York house, to be delivered to the plaintiff, were requested by the plaintiff, and were forthwith furnished to him, and which he had in his possession on the 18th of December, 1885. That in the statement as of November 1st, 1885, it appears that under date of October 5th, 1885, on the credit side, 100 shares of Missouri, Kansas and Texas Railroad Company stock are entered as " delivered ; " and in the statement of December 1st, 1885, it appears that under date of Novem-

ber 4th, 1885, on the credit side, 400 shares of New York, Lake Erie and Western Railroad Company stock are entered as "delivered." And it is conceded that the stocks thus entered in the statements of account as "delivered" had been paid for by the plaintiff; and he was, of course, entitled to the delivery of the stocks as of the dates of those entries.

It is also among the undisputed facts, that on the 18th of December, 1885, Rhett, the clerk of the defendants, went to the store of the plaintiff and there delivered to the latter a statement of account, made up to the 17th of December, 1885, and at the same time delivered to the plaintiff 500 shares of Texas Pacific Railroad Company stock, for which the plaintiff receipted, and according to the showing of the account rendered, Rhett asked for and received of the plaintiff a check for $1194, as being in full of the amount due the defendants to that date. Immediately after Rhett left the store, Palmer appeared and delivered to the plaintiff a memorandum statement, not in the form of any prior statement that had been delivered, but quite different, and at the same time delivered the raised or forged certificates of stock; and, according to the memorandum statement furnished of the amount due on the stocks, after deducting the amount of the check that had just previously been given on the settlement with Rhett, Palmer made the amount due the defendants on account the sum of $4378.31, and for which the plaintiff then and there gave him the check for $4378.31, payable to the order of the defendants, and Palmer gave a receipt therefor as in settlement of account in full. It is conceded that this check obtained from the plaintiff, payable to the order of the defendants, was, on the 19th of December, 1885, indorsed for deposit to the credit of the account of the defendants in the banking house of Garrett & Sons, by Palmer, and that the defendants did in fact receive such credit, and

the check was duly paid, and the amount thereof entered as a credit in the bank book of the defendants; but that the amount of the check was afterwards entered as a credit in the account of Morrison, a customer of the defendants, by Rhett, the defendants' clerk, under some impression made upon him that the credit belonged to that account, though in fact it did not.

It is not disputed that Palmer was in the employ of the defendants from the commencement of the dealing of the plaintiff with them to about the middle of December, 1885; and that his duties and powers comprehended the receiving of orders for the purchase and sale of stocks and securities; the transmission of such orders to the New York house, the receipt of securities and the delivery thereof to customers, and, occasionally, the delivery of monthly statements to those entitled to receive them; and especially were such duties performed by him in the transactions had by the plaintiff with the firm of the defendants. It is contended by the defendants that immediately, upon discovering the fact of the false and simulated statements of account furnished the plaintiff by Palmer, they dismissed Palmer from their service, and that this was before the transaction of December 18th, 1885 ; but it is denied by the plaintiff that he had any knowledge whatever of the discharge of Palmer at the time of that transaction in regard to the stocks and the check, and not until some time thereafter. The certificates of stocks were put carefully away in a safe deposit by the plaintiff, and their raised and forged character was not discovered until some time in June, 1886, when they were taken to the offices of the railroad companies for transfer. Thereupon demand was made upon the defendants for the delivery of genuine certificates of stock, and that demand being refused, the action was brought.

If there was no other evidence in the case required to be considered than the facts enumerated in and made the

basis of the first, second and seventh prayers of the plaintiff, we should hold without hesitation that those prayers are unobjectionable. But those prayers do not embrace all the facts of the case, and all of them conclude to the right of the plaintiff to recover, and thus exclude from consideration all other facts that might or could change or modify the conclusion to be drawn from all the facts of the case. Prayers concluding as these do should embrace all the facts in proof, as well those in support of the claim of the plaintiff as those in support of the defence, unless it be where the finding of the facts in support of the claim of the plaintiff necessarily negatives the proof of the facts offered in support of the defence, or *vice versa.* In other words, where one state of facts will not consist with the other.

In this case the defence is, first, that Palmer was not the agent of the defendants at the time of the delivery of the raised or forged certificates of stock, and the acceptance of the check as in full of the balance on settlement; second, that if the plaintiff was then entitled to treat Palmer as still in the employ of the defendants, the transaction of that date with him was not within the scope of his authority, and therefore not binding on the defendants; and third, that the plaintiff in conducting the transactions with Palmer, resulting in the loss sued for, was guilty of such negligence and want of ordinary care as to operate an estoppel on him, and so preclude the right of recovery against the defendants for the loss sustained by the fraud of Palmer. And it was the object of the prayers offered by the defendants, which.were rejected, to present and obtain the benefit of these grounds of defence, in the consideration of the case by the Court.

It is a very well settled principle of law, that if a person has dealt with an agent within the limit of the authority confided to him, or within a course of busi-

ness by the agent which has been sanctioned and approved by the principal, such person has the right to assume, if not otherwise informed, that the authority in the agent continues; and when the dealing continues after the authority is revoked, the principal is nevertheless bound, unless notice of the revocation of authority is brought home to the party so dealing with the supposed agent. *Sto. Ag.*, sec. 470; *McNeilly vs. Continental Life Ins. Co.*, 66 *N. Y.*, 28; *Hatch vs. Coddington*, 95 *U. S.*, 56. And it follows, as a logical consequence from this principle, that the onus of proof of the fact of discharge and notice thereof is on the party who denies the authority of the agent. But whether the act or acts of the agent in question were within the scope of the recognized powers or duties of such agent, or were of the class of acts or transactions that the agent was allowed to do or perform in the name of the defendants, in the course of their dealing with customers generally, *or with the plaintiff*, were questions of fact that were properly submitted to the finding of the Judge, by the prayers of the plaintiff, upon the whole evidence. But it is objected to these prayers, that they fail to submit for consideration, and entirely ignore, all the facts and circumstances of the case relied on by the defendants for the purpose of raising an estoppel upon the plaintiff, as to his right to recover for and in respect to the stocks and check mentioned and allowed for in the verdict of the Court; and it would appear that the objection is well taken. For without in any manner intending to intimate what conclusion should be drawn from the facts in proof, we think there are circumstances that should have been considered in support of the defence taken by the defendants. We are of opinion that, as reflecting upon the question of estoppel, there should have been submitted for consideration, all the circumstances immediately connected with the fraud of Palmer in dealing with the

stocks purchased by the defendants for the plaintiff and allowed for by the Court; the furnishing the plaintiff with the false and simulated statements of account, the discovery thereof, and the correction by duplicates of the true accounts, which remained in the possession of the plaintiff, and what those accounts indicated as to the previous dealing; the subsequent delivery to the plaintiff of the raised and forged certificates of the stock, and all the circumstances of the settlement by the plaintiff with Palmer, and the passing of the check to the latter on such settlement, in view of the settlement just previously made with Rhett, and all the facts and incidents of those transactions, and the facts immediately connected therewith, and the subsequent discovery of the fraud; as tending to show that the plaintiff had the means and facility in his possession, or at his command, for the prevention or detection of the fraud of Palmer, and which would have enabled him, by the exercise of ordinary prudence and care, such as reasonably careful business men generally exercise in such transactions, to prevent or detect the fraud before its final consummation, or to discover its perpetration within a reasonable time thereafter so as to afford to the defendants an opportunity to seek restoration or indemnity of the delinquent agent.   Such degree of care and prudence is required of the plaintiff for the protection of the defendants, if the latter be ignorant and blameless themselves, in regard to the particular transactions.   In all such cases, the question whether there has been exercised in regard to the transactions involved that ordinary and reasonable degree of care required of the party or parties, under all the circumstances disclosed, including the relation of the parties and the course of dealing between them, is one of fact; and hence it was necessary that that question should have been submitted to the finding of the Judge by the prayers of the plaintiff.

It is the settled doctrine of many cases upon this subject, that negligence, to amount to an estoppel, must be in the particular transaction itself, and be the proximate cause of leading the adverse party into mistake, and also must be the neglect of some duty which is owing to such adverse party or to the general public. This is the doctrine as settled by the case of *Hardy & Bros. vs. Chesapeake Bank,* 51 *Md.,* 562, 571; and it is the doctrine as settled by the English Courts, and by the Supreme Court of the United States. *Governor and Company of the Bank of Ireland vs. Trustees of Evans Charities,* 5 *Ho. L. Cas.,* 389, 410; *Arnold vs. The Cheque Bank,* 1 *C. P. Div.,* 578; *Leather Manufacturers' Bank vs. Morgan,* 117 *U. S.,* 96. The doctrine is of comparatively modern growth, and it has been so formulated as to promote the ends of justice, and it has no application except where the purposes of justice require it. Therefore it has been well said by the Supreme Court, in *Bank vs. Morgan, supra,* that the Courts "to promote the ends of justice, have sustained the general principle that, where a duty is cast upon a person, by the usages of business or otherwise, to disclose the truth—which he has the means, by ordinary diligence, of ascertaining— and he neglects or omits to discharge that duty, whereby another *is misled in the very transaction to which the duty relates,* he will not be permitted, to the injury of the one misled, to question the construction rationally placed by the latter upon his conduct." But while this principle is both just and beneficent in a state of circumstances which may make it properly applicable, we must be careful that it be not carried too far. It must be confined to the particular transaction in question, and not be allowed to depend upon remote or collateral facts or transactions; and the alleged negligence and omission of duty must be the direct and proximate cause of the loss sustained. Nor can the estoppel be raised

against a party for any mere neglect of what would be prudent in respect to himself or his own interest, or even neglect of some duty owing to third persons with whom those seeking to set up the estoppel are not privy. *Arnold vs. The Cheque Bank*, 1 *C. P. Div.*, 578, 588. All that can be required of a party is that he act with that ordinary diligence and care that reasonably prudent business men generally observe, under the like circumstances, in examining the statements of his accounts rendered, and in making settlements with reference thereto, to avoid errors and to prevent or detect frauds, where the neglect of that degree of care may operate to the prejudice of parties with whom he deals. More than this, ordinarily, cannot be required. *Hardy & Bros. vs. Chesapeake Bank*, 51 *Md.*, 591. A party who employs an agent and puts him in a position of trust to transact business with third parties, cannot be relieved of liability for the frauds and misdoings of such agent, unless it be shown that the loss sustained, as the result of such frauds, would not have occurred but for the neglect and want of ordinary care on the part of the party seeking to hold the principal liable ; nor can the principal be relieved in such case, if by the exercise of due and reasonable care in respect to the duties of the agent, the loss would not have occurred. But it has been held in several cases, that as the right to seek and compel restoration and indemnity from the party committing the frauds might have proved a valuable one, it is a sufficient defence to the right to recover, if it is made to appear that the defendants, by reason of the negligence of the plaintiff, and of his negligence alone, were prevented from exercising the right of seeking restoration or indemnity within such reasonable time as the right might possibly have been available to the end. *Leather Manufacturers' Bank vs. Morgan, supra.* What is such reasonable time, however, is purely a question of fact,

under all the circumstances of the case.    *McKenzie vs.
British Linen Co.*, 6 *App. Cas.*, 82.

It follows from what we have said that there was
error in granting the first, second, and seventh prayers
of the plaintiff, for the failure to embrace and submit
for consideration the facts tending to support the estop-
pel sought to be raised by the defendants.    But we
think there was no error in refusing to grant the sev-
eral prayers offered by the defendants.    The first, sec-
ond and eighth of those prayers may be considered as
out of the case, in view of the finding of the Court in
respect to the stocks to which those prayers related.
But the third, fourth, fifth, tenth and eleventh prayers
are objectionable, because they are too broad, and com-
prehend too many matters that are collateral and with
but an indirect relation to the main transactions, and
therefore not elements to raise an estoppel against the
plaintiff in respect to the very transactions involved in
this case.    Moreover, the prayers are objectionable, be-
cause they unduly restrict the authority of Palmer, by
confining the consideration of the Court to certain enu-
merated facts, and thereby excluding others that should
be considered as bearing upon the question of authority.

The transaction in regard to the C., M. & St. Paul
stock, and that in regard to the United States bonds,
referred to in the prayers, while they may show the
course of dealing, and reflect upon the question of
knowledge, cannot be invoked to show negligence on the
part of the plaintiff, and thus be made, even in part,
the basis of an estoppel in respect to the particular
transactions here involved.    Nor do we think that be-
cause the plaintiff repeatedly requested Palmer, as the
agent of the defendants, to deliver the particular stocks
in question, and that Palmer delayed, and offered ex-
cuses which were accepted by the plaintiff, and that the
latter did not complain to the defendants of such delay,

would constitute a ground of estoppel. To say that such acquiescence or non-action on the part of the plaintiff would constitute an estoppel, would be going very much farther than any decided case of which we are aware, and would fix a criterion that would be most dangerous in the transaction of business entrusted to the conduct of agents. If a party places an agent in a position to transact a certain kind or character of business, and the agent, while professing to act in respect to that business, in his dealing with a third party interested in the subject-matter, makes representations as to such subject-matter, upon which the third party relies, supposing them correct, the mere reliance upon such representations, though they prove to be unfounded, can never be set up as an estoppel, upon any theory that it is the duty of such third party to mistrust the representations of the agent, and to communicate such suspicion to the principal. The doctrine of estoppel has never been carried to such an extent. And the extent of Palmer's authority in dealing with the stocks in question, and to make the settlement with the plaintiff on the 18th of December, 1885, depends upon the relation of Palmer to the defendants from the commencement of his employment, and during the time that the plaintiff dealt with the firm ; unless the defendants show affirmatively that his powers and duties had been restricted, to the knowledge of the plaintiff. These questions, of course, are apart from the question of the imputed negligence of the plaintiff in his failure to examine the monthly statements furnished him, and the securities received, within a reasonable time after he received them.

The sixth, seventh and ninth prayers of the defendants go to questions of the legal sufficiency of proof as to certain propositions involved ; but we think the Court was clearly right in rejecting them all. The eleventh prayer was made dependent upon the finding the facts

set out in the preceding prayers, and as we hold that those prayers were defective in their collocation of facts, it follows that this eleventh prayer is objectionable for the same reason.

The remaining question is one as to the measure of damages. And in regard to this we think the rule adopted by the Court below, as to the stocks allowed for, was erroneous. The general rule is, doubtless, in actions for conversions, that the value of the thing converted, at the time of conversion, with interest to the time of trial, afford the proper measure of damages. Here the stocks were purchased for the plaintiff and were paid for by him, and he had demanded the delivery of the stocks, and they were charged as delivered as of certain dates. He was therefore entitled to them as of those dates, and could at once have instituted actions for them, or their value. It is not claimed that the defendants either sold the stocks for their own account, or actually converted them to their own use. They were fraudulently converted by a third party, in no way for the use or benefit of the defendants. The value of the stocks at the time they were charged as delivered, with interest to the time of trial, should be made the measure of recovery. As to the check, there was no error in regard to the time from which interest was allowed. The judgment must be reversed and a new trial awarded.

*Judgment reversed, and*
*new trial awarded.*

(Decided 19th June, 1890.)