Barnett *et al.* *vs.* The Central Line of Boats.

AARON BARNETT *et al.*, plaintiffs in error, *vs.* THE CENTRAL LINE OF BOATS, defendant in error.

1. Where A, a common carrier, wrongfully and fraudulently takes goods to be conveyed to the owner, knowing that B, another common carrier, has made a contract with the owner for the carriage of the same for hire, the former is liable to the latter in damages to the amount of freight he would have earned under his contract.

2. If the owner of the goods had assigned the bill of lading to B, and the owner refuse to receive them from A, and B demands and receives the goods from A, and then deliver the same to the owner, who accepts them, such carrier so delivering must assert his claim for the freight against the owner.

3. But if B, in order to obtain possession of the goods, has been compelled to pay A the amount for freight which the owner was to pay him, he is entitled to recover back the same from A.

4. If the goods, when received by B and delivered to the owner, were damaged so that the owner had a right to recoup for the damages against B's claim for freight, B may recover the amount of the damages from A.

5. Would B, in this case, by reason of his special property in the goods arising out of the assignment of the bill of lading to him and his lien on the goods for his claim for freight, have a right of action against A for the damages? Quere.

6. There being no evidence in the record showing that defendants in error had any right to claim freight on the coal, or what amount of damages was done to the hay, and they not being entitled to recover from plaintiff in error the amount which was paid for freight from New York to Apalachicola, the verdict is too large, and the judgment is reversed with instructions.

Carriers. Freight. Recoupment. Damages. Before Judge JAMES JOHNSON. Muscogee Superior Court. April Term, 1873.

The Central Line of Boats brought case against Aaron Barnett and Daniel Fry, as the owners of the steamboat New Jackson, making, substantially, the following case :

It claimed to be a common carrier, using certain boats on the Chattahoochee river, from Apalachicola to Columbus. Conant & Young shipped on the schooner Lizzie Major, from New York to the port of Apalachicola, consigned to William H. Young, or to his order, six hundred and thirty-six bales of hay, to be delivered to said Young, his order or assigns. Plaintiff agreed, for a certain reward, to receive the hay at Apalachicola and to deliver fifty bales at Wright's landing, one hundred bales at Eufaula, and the balance at Columbus. Said Young assigned bills of lading to plaintiff, and directed the master of the schooner to deliver the same to it. Whereupon the plaintiff dispatched one of its steamers to Apalachicola to receive said hay and deliver the same as it had agreed to do. It exhibited to the master the direction of said Young, and offered to pay him the freight due. But before that time the defendants, knowing the premises, but contriving and fraudulently intending to injure the plaintiff, and to deprive it of the hire and reward it would have received from the carriage of the hay, falsely represented to the said master of the schooner that they were authorized to receive said hay, by means whereof and the agreement of defendants to receive it in a damaged condition, the said master was induced to and did deliver the said hay to the defendants. Plaintiff demanded it from them, and offered to pay the charges of the schooner, but defendants, intending to deprive the plaintiff of the hire and reward it would have received, and intending to prevent it from fulfilling its undertaking with said Young, refused to deliver, but carried the hay on their boat and left at Eufaula one hundred and eight bales in a damaged condition, and ninety-two sound bales at same place, and brought up

the balance to Columbus, and offered to deliver to said Young, who declined to receive the same, having given plaintiff an order and holding it responsible for the delivery. Plaintiff then again demanded said hay of the defendants, who again refused to deliver it unless plaintiff would pay them $458 29, without having an opportunity to examine the same as to condition or quality, which sum plaintiff then paid under protest, and received of said hay one hundred and thirty-two bales badly damaged, thirty-one damaged, and two hundred and fifty-six sound. By which premises plaintiff was deprived of the hire and reward it might and would have received for the carriage of the hay, and also $458 29 which it was compelled to pay, and $50 00 for hire earned by it in carrying the fifty bales to Wright's landing, and $500 00 damages paid to said Young for injury to the hay and for nineteen bales converted by defendants.

The second count was similar, except it is in respect to seventy-two tons of coal, consigned to D. J. Willcox, at Columbus, which was brought to Columbus by defendants and delivered to plaintiff, upon payment of $290 00 freight.

Defendants pleaded the general issue.

### EVIDENCE FOR PLAINTIFF.

Charles I. Hockstrasser, sworn, says: He was captain of steamer New Jackson, one of the boats of the Barnett line, in March, 1870; the boat was at Apalachicola, Florida, when the vessel Lizzie Major arrived; witness went out in the bay in a yawl to the vessel, and the captain reported his vessel to be in distress, the cargo to be damaged, and the anchors lost. The captain proposed to witness to take off the hay and coal; witness and the captain went up to town together in the yawl; the captain had doubts about shipping the hay and coal on the boat; witness supposed he had heard that the Central Line of Boats had an order for the hay and coal. The captain came on the boat and went back into the cabin with A. Barnett and Daniel Fry, and they had a conversation; witness was not present; after some twenty minutes the captain came out and told wit-

ness he would ship the freight on the boat; witness went down next morning with the boat to the vessel, which lay some six miles off, and took on the hay and coal; some of the hay was damaged; no survey was held; was two or three days taking on the hay and coal; when the boat went back to the town, and just before she was ready to start up the river, saw a boat's smoke up the river—supposed it was the Atlanta, a boat of the Central Line of Boats, and supposed the boat had an order from the owners for the hay and coal. Barnett saw the smoke, and told witness to hurry up and get off—he did so because he wanted to start before the Atlanta arrived; he supposed the Atlanta was coming down after the hay and coal. The best of his recollection is that the freight on the hay and coal to Columbus was between $500 00 and $600 00; the New Jackson brought up the hay and coal; left over one hundred bales of hay at Eufaula, by order of W. H. Young, the consignee. The order was directed to the Central Line of Boats; there was no order from W. H. Young to the boat to deliver; brought the balance to Columbus and offered it to W. H. Young; Mr. Young declined to receive the hay; Mr. Willcox, the consignee of the coal, received the coal and paid the freight; the agent of the Central line received the hay and paid the freight and charges at Columbus; there were seventeen bales of hay; there was a lot of hay in bulk on the boat; the bales had burst in handling; this bulk represented the seventeen bales; Mr. Young declined to receive it, and the agent of the Barnett line sold it, and has the proceeds.

*Cross-examined:* Says he knows of no fraud or representations made to the captain of the Lizzie Major to induce him to ship the freight on the New Jackson; the captain proposed to ship it; he, witness, did not propose to take it; the captain of the Lizzie Major shipped the hay and coal because his vessel was in distress, and having only one small anchor he feared the vessel might be blown out to sea; his recollection is the freight was fifty to seventy-five cents per bale on hay; does not remember about coal.

...... Whitesides sworn, says: The Atlanta was sent down

from Bainbridge to Apalachicola; it would take three days to make the trip and return; the expense of the boat was about $120 00 per day; the boat brought no freight from Apalachicola; did not get a full load on the trip; could have brought up the hay and coal with the load without extra expense; the freight on the hay was to be paid at fifty cents per bale, and coal at $4 00 per ton; does not remember number of bales of hay; there were seventy-two tons of coal.

Charles Green sworn, says: The bills of lading produced are the originals received by Mr. Young for hay shipped from New York to Apalachicola by schooner Lizzie Major, and the entries on the back were made by direction of Mr. Young. He, as agent of Mr. Young, made a contract with the Central Line of Boats to bring up the hay. The boat was to receive fifty cents per bale; there were six hundred and thirty-six bales. The agent of the Barnett line had proposed to bring the hay, but he informed the agent that he had contracted with the Central line. This was a week or two before the Lizzie Major arrived. Mr. Young refused to receive the hay from the defendants.

The bills of lading were then introduced, with the refusal of Mr. Young indorsed thereon, to receive the hay from the defendants, for the reason that he had delivered an order to the plaintiff for the same.

The defendant, Barnett, testified by answers to interrogatories, as follows: Charles J. Hockstrasser was captain of the steamboat New Jackson in February and March, 1870; I do not remember who was captain of the Atlanta at the time, or of the Lizzie Major; I do not of my own knowledge know in what condition the Lizzie Major was when she arrived at Apalachicola; she was loaded; the steamer New Jackson received the freight of said vessel. The circumstances under which she took the freight were as follows, viz: I was in Apalachicola, Florida, some time during the months of February and March, 1870, and while there Captain Hockstrasser, of the steamer New Jackson, learning that a vessel had arrived in the bay, loaded, took the steamer's yawl and went out to

her; on his return, he reported the vessel in distress. About the same time the captain of the vessel came up to the town, and stated that the vessel was in distress, as well as his fears that should a storm arise the vessel and cargo would be lost, and therefore arranged with Captain Hockstrasser to take it up the river to its destination.

The contract in reference to the freight was made between the captains of the vessel and steamer, and a proper bill of lading signed, by which the captain of the vessel was the shipper; where the freight was to be carried to, or to whom delivered, or at what rate, I cannot now remember. The condition of the contract was, that if the captain of the vessel received orders from the consignees of the freight to deliver the cargo at the wharf at Apalachicola, the captain of the steamer agreed, on demand of the shipper, who was the captain of the vessel, to deliver the same at the wharf, in which event the captain of the steamboat was only to charge a reasonable compensation for what the services were worth; this demand was not made to my knowledge.

At the time that the New Jackson received the freight the vessel was lying in the bay of Apalachicola, about three or four miles from the wharf. The New Jackson remained in the bay receiving the freight two or three days, and at the wharf of Apalachicola. A short time only elapsed between the arrival of the Atlanta and departure of the New Jackson; I do not remember exactly how long.

The captain of the New Jackson conferred with me as to the cargo, and I advised him, as I would at any time, not to refuse freight. A short time before the departure of the New Jackson, Mr. Stevens, who, I believe, was the clerk of the steamer Atlanta, came to me on the wharf, and said, "I demand this freight." I replied to him simply that I supposed the New Jackson was in possession of the cargo legally, and had signed a proper bill of lading for it.

No authority to receive the freight was exhibited to me by any officer of the steamer Atlanta, nor was any exhibited to the captain of the New Jackson, as far as I know. I did not

go up the river on the New Jackson, but supposed the freight was delivered as consigned.  I know of no damage that could have occurred to the steamer Atlanta in the matter further than the disappointment in securing the freight, which was a matter of common occurrence to all steamboats.  The Atlanta was in the prosecution of her regular trade at the time.

I had no authority to receive either the hay or coal, nor do I know that the steamer New Jackson had any from the consignees.  I was a passenger on the boat at the time.  I know nothing as to delivery of the freight.  I urged the captain of the New Jackson to hurry his preparations in leaving Apalachicola, because the boat had already been detained there several days in taking in the cargo, and the receipts from freight on the same would hardly pay expenses, and no other reason that I know of; I did not know that the smoke was that of the Atlanta, or of what boat, and urged the departure of the New Jackson promptly for the purpose of saving time. I was a part owner of the steamer New Jackson at the time.

The jury returned a verdict for the plaintiff for $743 86. The defendants moved for a new trial, because the verdict was contrary to the law and the evidence.  The motion was overruled, and defendants excepted.

. PEABODY & BRANNON, for plaintiffs in error.

R. J. MOSES, for defendant.

TRIPPE, Judge.

1. The Central Line of Boats, as a common carrier, had contracted with Young, the consignee and owner of certain goods shipped from New York to Apalachicola, to receive and carry the goods from the last mentioned place to Columbus, Georgia, leaving certain portions of them at Eufaula and Wright's landing, *en route.*  The bill of lading was assigned to the carrier with a special order for the delivery of the goods. The declaration charges that plaintiffs in error, knowing this, wrongfully and fraudulently obtained the goods from the ves-

sel which had brought them to Apalachicola, and thereby deprived the defendant in error of the freight which it would have earned under the contract. Is the former liable to the latter in an action for damages? Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action: Revised Code, sec. 2957. In 2 Chitty's Pleadings, 691, the form of a declaration is given in a case in which plaintiff had a verdict, where the defendant, who was a wharfinger, falsely represented to the person, (master of a ship,) who was in possession of the goods directed to plaintiff's wharf, that he was authorized to receive them, etc., whereby plaintiff was deprived of the profits of storage, wharfage, etc. Also one against a defendant for representing that plaintiff's wagon set out from his inn, by means of which he obtained possession of and sent by another wagon, two parcels, which plaintiff had contracted with the owner thereof to carry for hire, to a certain place. When the plaintiff below contracted with the owner of the hay for its transportation, and received an assignment of the bill of lading, it had a right to demand and receive possession of the hay, and to carry it to its destination, and to be paid for the same. When the defendants got it they deprived him of this right, and if they wrongfully acted, there were both *injuria et damnum.* It was a tort, an invasion of the legal right of another: Code, section 2951.

2. When the owner refused to receive the hay from plaintiffs in error, and the Central Line of Boats demanded and received it from them, and delivered the same to the owner who accepted it, the owner was bound to pay the carrier thus delivering, the freight on the same, and such carrier must assert his right therefor against him. This would be the general rule.

3. But if the Central line, in order to obtain the possession, was compelled to pay to plaintiffs in error the amount for freight which the owner was to pay, then the Central line was entitled to recover back such amount from them. It would not be like the case of a voluntary payment. Money

paid to obtain possession of property which the party making the illegal demand has under his control, can be recovered back : 4 Metcalf, 189 ; 7 B. & C., 73 ; 2 *Ibid.*, 729 ; 7 Greer, 134; 9 John., 201: See Elliott *vs.* Swartwout, 10 Peters, 137 ; 4 Term Reports, 485; 1 Taunt., 358. Nearly all these cases recognize the distinction between a voluntary payment and payment made under compulsion.

4. It would seem to be a pretty clear proposition, that if the hay, when it was received by the Central line from the other carriers, was damaged so that the owner could recoup therefor against its claim for freight, then the Central line would be entitled to recover from them for such damages. We do not say whether the damage to the hay was recoverable against the owner of the vessel that brought it to Apalachicola, or that any carrier was responsible for it. But if the plaintiffs in error received it in a damaged condition without a survey, and paid full freight from New York, when a deduction should have been made for the damage, then they were not entitled to demand for what they had so illegally paid. And if the Central line was compelled to pay the whole amount of charges in order to get possession of the hay, without the privilege of examining into its condition, and there was such damage that the owner had a right to set it up against the Central line's claim for freight, it had a right to go back on the Barnett line for indemnity.

5. Would the Central Line of Boats, by reason of its special property in the hay, arising out of the assignment of the bill of lading, and its lien on the hay for its claim for freight, have a right of action against plaintiffs in error ? Quœre.

6. We have said nothing thus far as to the coal. There is no evidence in the record that the contract with the Central line covered the coal, nor is there any transfer of any bill of lading therefor, or any proof of any order for it given to the Central line. The owner of the coal accepted it from the defendants below, and paid them the freight on it. There was likewise no proof of what amount of damage was done to the hay, so that a jury could ascertain, with any reasonable cer-

tainty, what to find therefor.   Nor can we say, from the evidence, that the amount paid for freight from New York to Apalachicola should be included in the recovery.   It is almost impossible to tell what items the jury did find for in their verdict.   We are satisfied it is too large, and as we do not see that, as the evidence appears in the record, the verdict should have been for more than the freight on the hay from Apalachicola to Columbus, which, at fifty cents per bale, would be $318 00, it is directed that if the defendant in error will write off all except that amount, the judgment shall stand affirmed for that sum, otherwise a new trial is granted.

Judgment reversed, with instructions.