# HERBERT K. JONES *v.* SHERWOOD DISTILLING COMPANY

*Wrongful Act by Corporate Agent—Scope of Employment— Demand of Excessive Charges—Compulsory Payment—What Constitutes.*

In an action to recover a sum paid, in excess of the proper charges, to secure the release of goods stored with defendant distillery company, *held* that the evidence that the person who demanded the payment was defendant's treasurer was sufficient to go to the jury.                                    pp. 30, 31

Corporations, as well as natural persons, are liable for the wilful tort of an agent acting within the general scope of his employment, without previous express authority or subsequent ratification.                                    p. 31

Whether the servant's act complained of was in furtherance of the master's business, within the scope of the servant's employment, is generally a question of fact for the jury.    p. 32

The burden is generally on the defendant to show that his servant, who committed the wrongful act, was not engaged in the course of his employment.                     p. 32

Acts of fraud by an agent, committed in the course of his employment, are binding on the principal, even though the principal did not in fact know of or authorize them, or derive any benefit therefrom.                     p. 32

Whether the fraud complained of was within the scope of the agent's real or apparent authority is ordinarily for the jury.
                     p. 32

That one was the general manager of defendant distillery company, in charge of its office, where he was when plaintiff's agent called to see about the release of certain whiskey stored with the company, *held* to justify submission to the jury of the question whether, in demanding payment of an excessive sum as a condition of the release of the whiskey, such employee was acting within the scope of his authority.                     pp. 32, 34

Even where the evidence is not conflicting, the question whether the act of an agent was within the scope of his authority should be submitted to the jury, if reasonable minds could draw different conclusions.                     p. 33

Payment to one person under duress imposed by another is compulsory.                     p. 35

The question whether plaintiff's agent, in paying an excessive sum as the price of the release of plaintiff's whiskey from defendant's warehouse, was negligent, so as to estop plaintiff from demanding a return of the excess payment, *held* for the jury, a prompt release of the whiskey being necessary in order that the agent be able to comply with plaintiff's orders to ship the whiskey by a vessel which was to sail in a few days.
                     pp. 34, 35

Testimony that defendant's treasurer and general agent refused to release plaintiff's whiskey in defendant's warehouse until a certain sum was paid, at the same time refusing to furnish a statement of the charges against the whiskey, that the plaintiff's agent had to secure prompt possession in order to ship the whiskey on a particular vessel, on which plaintiff had agreed with his vendee of the whiskey to ship it, and on which

he had arranged for its transportation, *held* to justify a finding that the payment of the sum named was compulsory, unless plaintiff had an adequate legal remedy to recover the whiskey, and chose to pay the money rather than resort to that remedy, or unless plaintiff's agent was guilty of fraud or negligence.

pp. 35-38

In view of the facts that the vessel was to sail in a few days, that a suit in trover was inadequate, and that a replevin suit would require a bond, which it would take some time to have executed and delivered, there was no adequate legal remedy available to plaintiff for the recovery of the whiskey.  pp. 38, 39

If the use of a legal remedy by the owner, to recover goods of which possession is refused him, would cause him great inconvenience or loss, the remedy is not considered adequate, so as to preclude the recovery by him of a payment made by him to obtain the goods, as made under compulsion.    p. 39

That the payment was made voluntarily does not prevent its recovery, if this was under the mistaken belief that it was actually due, and such belief was fraudulently induced by the payee's representative.    p. 39

In a suit to recover a payment, made by plaintiff to a third person, on demand of defendant's manager, to secure possession of plaintiff's goods on storage with defendant, a written lease of an apartment, in which plaintiff's agent met such third person, was not admissible merely because signed in the name of such manager, there being no evidence that he signed it.    pp. 39, 40

*Decided January 29th, 1926.*

Appeal from the Superior Court of Baltimore City (SYMINGTON, J.).

Action by Herbert K. Jones against the Sherwood Distilling Company and Robert J. Aylward. From a judgment for defendant company, plaintiff appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and WALSH, JJ.

*John Holt Richardson* and *Allan W. Rhynhart,* with whom was *Edward D. E. Rollins* on the brief, for the appellant.

*Charles Jackson,* with whom was *Arthur R. Padgett* on the brief, for the appellee.

WALSH, J., delivered the opinion of the Court.

The chief questions to be determined in this case are whether an exorbitant sum of money paid by the agent of the appellant to secure the release of two hundred barrels of whiskey, stored in the warehouse of the appellee, was paid voluntarily, or was paid under such circumstances as would render it a compulsory payment, and thus entitle the appellant to recover the excess over and above the proper warehouse charges, and, further, whether or not this excess can be recovered from the appellee, even if the payment was compulsory.

Herbert K. Jones, of Boston, Mass., the appellant, being the owner of two hundred barrels of Sherwood whiskey stored in the warehouse of the Sherwood Distilling Company at Cockeysville, Baltimore County, Maryland, employed Michael Garvey, of Melrose, Mass., an experienced custom house broker, to arrange for the export of the whiskey to Scotland on board the steamship City of Flint, which vessel was owned by the Oriole Steamship Company and was scheduled to leave Baltimore on or about January 1st, 1923. Garvey arrived in Baltimore on December 26th, 1922, and on December 28th, 1922, in company with Mr. Gochnauer, an employee of the steamship company, he went to the distillery at Cockeysville, some ten or fifteen miles from Baltimore, and there delivered the certificates for the whiskey to a Mr. Haim, the general manager and treasurer of the distilling company, and asked him for a statement of the charges against the whiskey. He also advised him that the whiskey was to be loaded on the steamship City of Flint, which was about to leave Baltimore, and asked him when the whiskey could be delivered. Haim promised to furnish a statement of the charges and to advise Garvey later, through the steam-

ship company, of the date on which the whiskey would be delivered.

On December 29th, 1922, Garvey was told, at the steam-ship company's office, to call a certain telephone number, and upon his doing so was asked to go to apartment 513 of the Hopkins Apartments, where he met a man who introduced himself as Mr. Aylward. This man had been present in the distilling company's office when Garvey and Gochnauer were talking to Haim the day before, and, though he took no part in the conversation, he "appeared to be interested therein." At the Hopkins Apartment he told Garvey that the cost of releasing the whiskey would be $7,500 to $8,000, and that this sum must be obtained at once or the whiskey would not be released. He also told him that neither a cashier's check nor a certified check would be accepted, but that the pay-ment must be made in cash, and that Garvey would "have to do business with him." Garvey thereupon wired his prin-cipal for $8,000 cash, and this sum was transferred to him at the Continental Trust Company, Baltimore, on December 30th, 1922. At 10 A. M. on that day Garvey met Aylward by appointment at the corner of Baltimore and Calvert Streets, and paid him $1,000 on account. In the afternoon of January 2nd, 1923, Aylward and Garvey went to the Hopkins Apartments and after a half hour wait Haim joined them. Haim then told Garvey, "You pay this money over to Aylward and you will get the release of that whiskey tomorrow, but you won't get it unless you do." Garvey paid the $7,000 in cash to Aylward, in the presence of Haim, and Haim then produced a statement showing that the charges against the whiskey amounted to $3,161.30, which statement he offered to receipt. Garvey declined to accept this receipt on the ground that a receipt for such a sum would be of no use to him in settling with his principal, and Haim assured him that if he had any difficulty with his principal he (Haim) was a witness to the money being paid. On the following day the whiskey was released by the Sher-wood Distilling Company, was loaded on the steamship City

of Flint on January 4th, 1923, and on the afternoon of that day the boat sailed. Garvey also testified that he thought the $8,000 charge unjust because it was $3,000 more than Jones, the appellant, estimated the charges would be, but he was not sure of its being unjust until he saw the bill, and he also said he protested about the payment.

On January 7th, 1924, the appellant entered suit against the appellee and Robert J. Aylward, alleging that the difference between the $8,000 paid and the $3,161.30 actually due was procured from the appellant's agent by reason of the unlawful demand of the agents and servants of the Sherwood distilling Company, made on its behalf, and their refusal to surrender the appellant's goods to him unless such excess was paid. A demurrer was interposed to the declaration, but overruled by the learned court below, and then, after an amendment by which Haim was alleged to be treasurer of the Sherwood Distilling Company instead of Aylward, as set out in the original declaration, a demurrer was again filed and again overruled. No mention of the court's action on these demurrers is made in the briefs, and we will not discuss this action further than to say that in our opinion the amended declaration, which is the only one properly before us, sets out a good cause of action, and there was, therefore, no error in the court's ruling in this regard.

At the conclusion of the plaintiff's case the court instructed the jury "that the plaintiff has offered no evidence legally sufficient in this case to entitle the plaintiff to recover against the Sherwood Distilling Company, and the verdict must be for the said the Sherwood Distilling Company, one of the defendants in this case," and because of this action, and a ruling on evidence made during the course of the trial, the plaintiff has appealed.

It does not appear from either the record or briefs what disposition, if any, was made of this case so far as Aylward is concerned, so that the only party to be considered on this appeal is the Sherwood Distilling Company, which will hereafter be referred to as the appellee.

The appellee contends that the evidence was legally insufficient to prove that Haim was its agent, or that he was acting within the scope of his authority so far as the transaction here involved is concerned, and it further contends that the payment made by Garvey was made voluntarily and cannot be recovered.

On the question of agency the testimony shows that on October 3rd, 1922, Irving Haim was elected general manager, treasurer and a director of the Sherwood Distilling Company, and resigned as treasurer and general manager on January 30th, 1924, that the 1923 report of the company, filed with the State Tax Commission of Maryland on March 6th, 1923, was signed by Irving Haim as treasurer, that when the agent of the Oriole Steamship Company first called the appellee's office at Cockeysville about the appellant's whiskey he was advised "he would have to see Mr. Haim, who was the manager." It further appeared that when Garvey and the steamship company's agent went to the appellee's office they transacted their business with a Mr. Haim, who was there in the office, that this was the same Mr. Haim who directed Garvey to pay the $7,000 to Aylward and was present when he did so, that it was also the same Mr. Haim who showed the steamship company's agent through the appellee's warehouse and plant while the whiskey was being loaded on the railroad cars on January 3rd, 1923, and finally, it was proved that the day after the money above mentioned had been paid to Aylward the whiskey was released, loaded on railroad cars, and on the following day delivered to the steamship company.

There can be no question under the foregoing testimony of the appellant's right to at least have the question of Haim's agency submitted to the jury. In *Heise & Bruns v. Goldman,* 125 Md. 554, 559, this Court, speaking through Judge Constable, said: "It is the undoubted rule of law of this state, and practically universal, that it is not for the Court to determine the question of agency *vel non,* but to determine whether there is any evidence tending to prove the agency,

·and if there is any such proof, although not full and satis-factory, it is the exclusive province of the jury to judge of its weight. 'Whether there be any evidence or not is a ques-tion for the judge; whether it is sufficient evidence is a ques-tion for the jury.' "

And see also *Nat. Mech. Bank v. Nat. Bank,* 36 Md. 5; *York Co. Bank. v. Stein,* 24 Md. 447; *Morrison v. Whiteside,* 17 Md. 452; *Henderson v. Mayhew,* 2 Gill. 393. Certainly in this case there is some evidence that between December 26th, 1922, and January 4th, 1923, Haim was the agent ·of the appellee.

The question of Aylward's agency is not so clear. The record shows that he was at one time director of the appellee, and preceded Haim as treasurer, but his connection with the appellee corporation in December, 1922, is not shown. However, in the view which we take of the case, Aylward's agency becomes unimportant if Haim's is established, and as the testimony regarding the latter is far stronger than that offered to prove the former, we can, for all practical purposes, disregard it. We might say, though, that in our opinion the appellant did not offer sufficient evidence to have the question of Aylward's agency submitted to the jury.

The next contention of the appellee, namely, that there was not sufficient evidence to show that Haim, in carry-ing on the transaction involved in this case, was acting within the scope of his authority, is more difficult to dispose of. Similar questions, however, have been before this and other courts on numerous occasions, and through these deci-sions the following general principles would now seem to be firmly established.

"Corporations, as well as natural persons, are liable for the wilful tort of an agent acting within the general scope ·of his employment without previous express authority or ·subsequent ratification." "While a corporation is non-personal in its formal legal entity, it represents natural per-sons and must necessarily perform its duties through natural persons as agents, hence must spring the correlative respon-

sibility for the acts of its agents within the scope of their employment." "The question whether the act of the servant complained of was in furtherance of the master's business, within the scope of the servant's employment, is generally one of fact to be determined by the jury," and it is generally held that the burden is "on the defendant to show that the servant was not engaged in the course of his employment." *Hopkins Chem. Co. v. Read Drug and Chem. Co.,* 124 Md. 210; *Consolidated Ry. Co. v. Pierce,* 89 Md. 495; *Evans v. Davidson,* 53 Md. 245; *Hypes v. Southern Railroad Company,* 82 S. C. 315, 21 L. R. A. (N. S.), 873; *Sawyer v. Railroad,* 142 N. C. 7; *Cleveland v. Newsome,* 45 Mich. 62; *Rounds v. D., L. & W. R. R. Co.,* 64 N. Y. 129. "Acts of fraud by the agent, committed in the course or scope of his employment, are also binding on the principal, even though the principal did not in fact know of or authorize the commission of the fraudulent acts, and although he derives no benefit from the success of the fraud." 2 C. J. 849, 850; *New England Mut. Life. Ins. Co. v. Swain,* 100 Md. 558; *Andrews v. Clark,* 72 Md. 396; *Tome v. P. B. R. Co.,* 39 Md. 36; *Western Maryland R. R. Co. v. Franklin Bank,* 60 Md. 36; *Lamm v. Port Deposit Co.,* 49 Md. 241; *Story on Agency* (7th ed.), sec. 452.

It is also established by the authorities just cited that the question whether or not the fraud complained of was within the scope of the agent's real or apparent authority is ordinarily for the jury.

We think the application of the principles just announced to the facts in the case now before us render the question of Haim's authority a proper one to be submitted to the jury. He was the general manager and treasurer of the distilling company, he was in charge of the company's office, and the appellant's agent found him there when he went to see about having the whiskey released. As general manager he would, in the absence of proof to the contrary, have charge of the appellee's business, and would be the natural person to consult about securing the whiskey which was stored in

the appellee's warehouse, and he would also ordinarily be the proper official to fix and estimate the warehouse charges. As treasurer he would likewise be authorized to receive money due the company, and, while this authority would not necessarily embrace the right to direct the payment of such money to a third person, we think the fact that Garvey was apparently directed to get in touch with Aylward by Haim, and actually paid $7,000 of the money to Aylward in Haim's presence and at his express direction, warrants submitting to the jury the question whether or not this conduct on the part of Haim was within the scope of his authority, real or apparent. Of course, the facts before us are not in dispute, and so it might be contended that there is nothing to submit to a jury, but such a contention ignores the different inferences which may be deducible from the same facts, and in this case we think there is a difference in the inferences which could reasonably be drawn from the undisputed facts. "Even where the evidence is not conflicting, the question should be given to the jury if reasonable minds could draw different conclusions therefrom." 2 *C. J.* 961, 962, 964.

So far as the questions of agency are concerned, the case of *New England Ins. Co. v. Swain, supra,* is closely analogous to the one we are considering. In that case an insurance agent fraudulently collected an insurance premium a second time and appropriated it to his own use, and in holding that the insured had a right of action against the insurance company to recover this excess payment, Judge Boyd, who wrote the opinion, said: "In *Tome v. P. B. R. Co.,* 39 Md. 36, this Court quoted with approval from *Story on Agency* (7th ed.), sec. 452, where the author, after saying a principal was not ordinarily liable in criminal proceedings for the acts of his agent, said, 'Yet he is liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligence and other malfeasances, or mis-feasances, and omissions of duty of his agent in the course of his employment, although the principal did not

authorize, or justify, or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies *respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby in effect he warrants his fidelity and good conduct in all matters within the scope of the agency.' "

It was also held in that case that the question whether or not the party defrauded was misled by the agent, as well as the scope of the agent's authority, were questions for the jury. And in *Andrews v. Clark, supra,* it was held that: "A party who employs an agent and puts him in a position of trust to transact business with third parties, cannot be relieved of liability for the frauds and misdoings of such agent, unless it be shown that the loss sustained, as the result of such frauds, would not have occurred but for the neglect and want of ordinary care on the part of the party seeking to hold the principal liable."

In the present case Haim was in charge of the appellee's warehouse, and Garvey, the agent of the appellant, simply followed his instructions in securing the release of his principal's goods. It can be argued that Garvey acted with singular simplicity throughout the transaction, and failed to heed the many warnings of irregularity which appeared all during the affair, and thus was himself guilty of negligence; but on the other hand it can be urged with equal force that he was charged with the duty of placing the whiskey on a ship which was to and did sail within a week from the time he first asked for the release of the whiskey, that he did not know what the charges would be other than the estimate of $5,000, which he stated his principal made, that he did not actually ascertain the correct charges until after he had paid the money demanded on January 2nd,

1923, just two days before the boat left, and that, under all the circumstances of the case, he acted in a reasonably careful and prudent manner, so that his principal is not now estopped from demanding a return of the excess payment. The determination of such a controversy should, we think, be submitted to a jury.

This brings us to the final contention of the appellee, which is that the payment made by Garvey was voluntary, and so cannot be recovered. In the case of *Lester v. Baltimore,* 29 Md. 415, this Court said: "No principle is better settled than that where a person, with full knowledge of the facts, voluntarily pays a demand unjustly made upon him, * * *, it will not be considered as paid by compulsion, and the party thus paying is not entitled to recover, though he may have protested against the unfounded claim at the time of payment made." And in *Baltimore v. Lefferman,* 4 Gill, 425, it was held, "that a payment is not to be regarded as compulsory unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid." See also *Awalt v. Building Assn.,* 34 Md. 435. And we apprehend that payment to a third person, at the direction of the party by whom the duress is imposed, would also render the payment compulsory. There is not much difficulty about the rule itself, though a somewhat broader statement of it is found in some authorities. The trouble arises when we try to apply it to particular cases.

As is said in 21 *R. C. L.* 146, sec. 170: "What shall constitute the compulsion or coercion which the law will recognize as sufficient to render (a payment) involuntary is often a question of difficulty. From the nature of the question no very precise rules can be laid down. * * * The real and ultimate fact to be determined in every case is whether or not the party really had a choice, and the determination of that question is for the jury." *Ritchie v. Sweet,* 32 Tex. 333, 5 Am. Rep. 245; *Cobb v. Charter,* 32 Conn. 358, 87 Am. Dec. 178.

In the following cases the payments were held to have been compulsory, and the party making them was allowed to recover the excess: Withholding a deed and threatening to destroy it unless the payment was made (*Motz v. Mitchell,* 91 Pa. St. 114); payment of an excessive gas bill to prevent the shutting off of the gas (*Indiana Natural, etc., Gas Co. v. Anthony,* 26 Ind. App. 307); payment by an agent of an excess on the purchase price of land to prevent delay in closing the transaction (*Carter v. Riggs,* 112 Iowa, 245); payment to actor to insure his appearance at an evening performance after bills advertising it had been distributed (*Dana v. Kemble,* 17 Pick. [Mass.], 545); the exaction of illegal toll charges (*Chase v. Dwinal,* 7 Me. 134, 20 Am. Dec. 352); and the weight of authority would seem to hold that excess freight charges, paid to secure the transportation of goods, or their possession after transportation, can be recovered. 21 R. C. L. 157, sec. 182; 6 *Cyc.* 498; *McGregor v. Erie R. R. Co.,* 35 N. J. 89; *Memphis, etc., Packet Co. v. Abell,* 17 Ky. L. Rep. 191, 30 S. W. 658; *Railroad Company v. Lockwood,* 17 Wall. 379; *Transportation Co. v. Sweetzer,* 25 W. Va. 434; *Maxwell v. Griswold,* 10 How. (U. S.), 242; *Harmony v. Bingham,* 12 N. Y. 99, 62 Am. Dec. 142; *C. & A. R. R. Co. v. C., V. & W. Coal Co.,* 79 Ill. 121; *M. & M. Rwy. Co. v. Steiner, etc., Co.,* 61 Ala. 560; *Kenneth v. S. C. R. T. Co.,* 15 Rich. L. (S. C.), 284, 98 Am. Dec. 382; *Parker v. Great Western Railway Co.,* 7 Man. & G. 253, 18 L. R. A. (N. S.), 124, note. These authorities do not conflict with the decision of this Court in *Potomac Coal Co. v. C. & P. R. R. Co.,* 38 Md. 226, in which the recovery of excess freight paid the carrier over a period of seven years was denied, because in that case the agreed statement of facts showed that the payments were made voluntarily, and the Court carefully commented on this in its opinion, and stated that there was no claim "that the money sought to be recovered, was paid under a mistake of the *facts,* or under circumstances of duress, fraud or extortion."

It is also held that "if a person has in his possession

property belonging to another, and refuses to deliver it to the owner without the payment to him of a sum of money which he has no right to receive, and the owner, in order to obtain possession of his property, pays that sum, the money so paid is a payment by compulsion, and especially is such the case where the wrongful detention is connected with circumstances of hardship or serious inconvenience to the owner." 21 *R. C. L.* 161, sec. 186; *Fargusson v. Winslow,* 34 Minn. 384. And this rule applies even though there may be a legal remedy, as by suit in replevin or trover, provided the use of the legal remedy would so delay the owner as to cause him serious inconvenience or loss. 21 *R. C. L.* 150, sec. 175; 30 *Cyc.* 1311; *DeGraff v. Board of County Commrs.,* 46 Minn. 319; *Joannin v. Ogilvie,* 49 Minn. 564, 16 L. R. A. 376; *Oceanic Steam Nav. Co. v. Tappan,* 16 Blatch, 297; *Astley v. Reynolds,* 2 Strange, 915; *Fout v. Giraldin,* 64 Mo. App. 163; *Sartwell v. Horton,* 28 Vt. 370.

In *Cobb v. Charter, supra,* an illegal payment made by the owner to obtain possession of a chest of tools illegally detained was held compulsory; in *Barnett v. Central Line of Boats,* 51 Ga. 439, a payment made to a carrier to secure possession of goods wrongfully retained by the carrier was held compulsory; in *Chandler v. Sanger,* 114 Mass. 364, 19 Am. Rep. 367, a payment made to secure the release of goods from an attachment made for purposes of extortion, was held compulsory; in *Quinnett v. Washington,* 10 Mo. 53, it was held that money paid to secure the release of goods from an illegal distress could be recovered, though in *Weber v. Aldrich,* 2 N. H. 461, just the opposite conclusion seems to have been reached; in *Briggs v. Boyd,* 56 N. Y. 289, money paid to secure the release of property held by one who wrongfully claimed a lien on the property was held to be compulsory payment, and in *Clark v. Pearce,* 80 Tex. 146, money paid to secure the release of property wrongfully seized by an officer was held to be a compulsory payment. And to the same effect see *Weber v. Kirkendall,* 44 Neb. 766; *Alston v. Durant,* 2 Strob. (S. C.), 257, 49 Am.

Dec. 596; *White v. Heylman,* 34 Pa. 142, and *Scholey v. Mumford,* 60 N. Y. 498.

While, as we have already said, no precise rule can be laid down as to just when a payment is compulsory, and each case has to be determined largely on its own particular facts, the authorities heretofore cited would seem to make it apparent that the testimony concerning the payment made in this case was sufficient to require submitting to the jury the question whether or not this payment was compulsory. There is testimony that the whiskey of the appellant was actually in the warehouse of the appellee, that the appellee's general manager and treasurer refused to release it unless the appellant's agent paid Aylward $8,000, and that he also declined to furnish a statement of the charges against the whiskey until this payment was made. There was also testimony that Garvey had to secure possession of the whiskey promptly so that it would be shipped on the steamship City of Flint, as his principal had contracted to deliver it to the purchasers in Scotland on that vessel, and arrangements for its transportation by that ship had been made. Delay beyond January 4th, 1923, meant that neither the transportation contract nor the contract of sale could be complied with, and these defaults would doubtless have resulted in loss to the owner. We think these facts and circumstances, if found by the jury to exist, would be sufficient to sustain a finding that the payment of the appellant was a compulsory one, unless the appellant had an adequate legal remedy for the recovery of the goods, and chose to pay the money rather than resort to that remedy, or unless the agent of the appellant was himself guilty of fraud or negligence. Garvey testified that the steamship City of Flint was scheduled to leave Baltimore on or about January 1st, 1923, though it did not actually leave until January 4th, that he did not make a demand for the whiskey until December 28th, 1922, and that he received no information about the charges until December 29th, when Aylward told him that he would have to pay $8,000 to get the whiskey, and he did not actually

know that the charges were excessive until after he completed paying the full $8,000 on January 2nd, 1923. December 29th, 1922, fell on Friday, and January 1st, 1923, fell on Monday, so that if Garvey, on December 29th, still understood that the ship would sail on January 1st, 1923, he had only one day, Saturday, December 30th, in which to take the necessary legal proceedings to obtain the whiskey, and even if he then knew that the ship would not leave until January 4th, and was put on notice by Aylward's demand that something was wrong, he still had but five days in which to get the whiskey on board. A suit in trover would not have been adequate, and a replevin suit would have required the filing of a large bond, which, because of the presence of the whiskey in Baltimore and of its owner in Boston, and perhaps for other reasons, it would have taken some time to have executed and delivered in Baltimore, where the suit had to be brought. It is difficult, if not impossible, to imagine a case in which some legal remedy for the recovery of goods would not be open to their owner, but the law does not require the owner to adopt such a remedy unless it is an adequate one, and if the use of the remedy would cause great inconvenience or loss it is not considered adequate. In this case we do not think the appellant had an adequate legal remedy, and, of course, the question of Garvey's duplicity or negligence was for the jury. It might be contended that Garvey paid the $8,000 voluntarily in the belief that this sum represented the actual charges against the whiskey, but such a contention would be of no assistance to the appellee, because such a belief, if it existed, was fraudulently induced by Haim and this constituted a deceit. And it is well established, as we have seen, that "money obtained by deceit and in bad faith, which the payee ought not to retain, may be recovered back." 30 *Cyc.* 1312; *New England Mut. Ins. Co. v. Swain, supra; Andrews v. Clark, supra.*

The only remaining point to be considered is the exception taken by the appellant to the exclusion of a written lease for apartment 513 in the Hopkins Apartments in the name

of and signed Irving Haim. There was no proof that the Irving Haim who was general manager of the appellee signed this lease, in fact the only evidence on the point was that the signature on the lease was not the signature of the Irving Haim involved in this case. Had there been proper evidence offered to show that Irving Haim, the manager of the appellee, was the person who signed the lease, we think it would have been admissible, but as there was no such evidence the lease was properly excluded.

For the reasons heretofore given the judgment will be reversed, and the case remanded for a new trial.

> *Judgment reversed and case remanded for a new trial, with costs to the appellant.*