# PAUL FURMAN *v.* WILLIAM WALLACE LANAHAN

ET AL.

[No. 25, January Term, 1930.]

*Decided March 13th, 1930.*

2

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and SLOAN, JJ.

*Edwin T. Dickerson,* with whom was *Harry W. Nice* on the brief, for the appellant.

*William L. Marbury* and *William L. Marbury, Jr.,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellees.

DIGGES, J., delivered the opinion of the Court.

The question presented for decision is the legal sufficiency of the cause of action brought by the appellant. There was a demurrer interposed to the amended declaration and sustained by the trial court. The plaintiff declined to further amend, and prosecuted this appeal from a judgment in favor of the defendant entered on the demurrer. The effect of the demurrer was to admit the well pleaded allegations of the declaration and to challenge their legal sufficiency to constitute a cause of action. It appears from the essential allegations of the declaration that the defendants (appellees here) were stockbrokers employing as their stock exchange manager Robert E. Ensor; that the plaintiff was a customer for whose account Ensor had bought and sold a large volume of securities, and that, at the time of the transaction complained of, the plaintiff had large sums of money on deposit with the defendants, and in addition thereto a large margin account; that at various dates, from June 25th to July 18th, 1928, Ensor sold for the account of, and at the risk of and on the credit of, the plaintiff, various securities at an aggregate price of $337,656.44, including commissions, which commissions were deducted by the defendants from the funds in their hands on deposit to the plaintiff's credit; that the plaintiff did not own any of the securities which were sold; that the sales in question were made by Ensor while acting within the

scope of his authority as agent, he (Ensor) well knowing that the plaintiff did not own the securities mentioned, and without the knowledge, consent or authority of the plaintiff, sold said securities; that when the plaintiff learned of the wrongful and unauthorized sales having been made, he protested to the defendants that said sales had been made without his knowledge, authority, or consent, but that the defendants, well knowing that their agent had made said sales without the knowledge, authority, or consent of the plaintiff, ratified and approved said unlawful acts of their said agent, and told the plaintiff that unless he purchased equivalent securities with which to cover said sales, they would do so at his expense and risk, and would pay the difference between his sales and repurchase prices of said securities, together with costs incident thereto, out of the funds of the plaintiff then on deposit with the defendants; that the plaintiff, because of said threat, and in view of the fact that the defendants then had in their possession a large sum of money belonging to him, out of which they could purchase such securities, and at great loss and expense to the plaintiff, and rather than suffer such possible loss and expense, and in order to emancipate his said funds on deposit with the defendants, was compelled to purchase the securities necessary to make good the sale made by the defendants' agent, at and for the sum of $365,172.51, including commissions which the defendants charged the plaintiff on said repurchases, together with the transfer taxes thereon; that the plaintiff, in consequence of said wrongful, unlawful and unauthorized acts of the defendants and their agent in the premises, was caused to incur heavy pecuniary loss represented by the difference between the price for which said stocks were wrongfully and unauthorizedly sold and their cost upon the repurchase, and in addition thereto was forced to expend large sums of money for commissions and transfer taxes on said stock, and to lose the interest on said sums which he was so wrongfully compelled to outlay and expend from the dates of the repurchase of said stocks, to the great wrong, damage, and injury of the plaintiff.

It thus appears from the allegations of the declaration that the plaintiff was the customer of the defendants, who were stockbrokers, who had bought and sold securities on account of and for the credit of the plaintiff. During the months of June and July, 1928, the defendants sold for the account of the plaintiff stock in three different corporations aggregating 4,000 shares for a large sum of money. The plaintiff did not own these securities, which fact the defendants well knew, and the sale was made without the plaintiff's knowledge, consent, or authority. When the plaintiff became aware of the sale, protest was made to the defendants in respect to their action in making the unauthorized sale, and he was told by the defendants that he must purchase the necessary securities to make good the short sale, and, if he failed to do this, the defendants would make the necessary purchases and charge the difference to the plaintiff's account. The declaration alleges that commissions were charged on the short sales, as also on the repurchases. There is an allegation that, by reason of the threat and in order to emancipate his funds on deposit with the defendants, the plaintiff "was compelled to repurchase" certain enumerated stocks. This last allegation would be gratified by proof that the plaintiff either purchased these securities personally, or had them purchased by some one else and paid for them himself. However, the further allegation that the defendants charged the plaintiff with commissions on the repurchase shows conclusively that the plaintiff did not personally repurchase these securities, but directed the defendants to do so. The allegation that the defendants had the plaintiff's funds, that he was compelled to repurchase the securities set out, and that the defendants charged the commissions for the repurchase, are equivalent to an allegation that the defendants repurchased these securities at the plaintiff's direction. In the final analysis, the transaction shown by the allegations of the declaration is that the defendants sold short certain securities for the account of the plaintiff, with a total absence of authority to do so. Upon

discovery, the plaintiff protested, and was told by the defendants that they had his funds in their possession, and that he must purchase the necessary securities to make good the short sale, or they would do so out of his funds. Whereupon, because of this threat, and to emancipate his funds in their possession, he directed them to make the repurchase. In other words, he authorized them to make the purchase, to prevent them from making it without his consent.

The question is: Do the circumstances here shown constitute such duress as will enable the plaintiff to recover the difference between the sale and repurchase prices, together with the costs incident thereto, and interest? We do not think so. Where money has been paid upon misrepresentation, under a mistake of fact, or under circumstances amounting to duress, it may be recovered in an appropriate action. *Jones v. Sherwood Distilling Company,* 150 Md. 24. But "no principle is better settled than that where a person, with full knowledge of the facts, voluntarily pays a demand unjustly made upon him, it will not be considered paid by compulsion, and the party thus paying is not entitled to recover, though he may have protested against the unfounded claim at the time of payment made." *Lesler v. Baltimore,* 29 Md. 415. In *Baltimore v. Lefferman,* 4 Gill, 425, it was held: "That a payment is not to be regarded as compulsory unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid; and that a payment made under the apprehension or even menace of an impending distress warrant would not render it a payment by compulsion." *Awalt v. Eutaw Bldg. Assn.,* 34 Md. 435. In *Jones v. Sherwood Distilling Co., supra,* Judge Walsh, speaking for the court, said: "While, as we have already said, no precise rule can be laid down as to just when a payment is compulsory, and each case has to be determined largely on its own particular facts, the authorities heretofore cited would seem to make it apparent that the testimony concerning the payment made in this case was sufficient to require submitting to the jury

the question whether or not this payment was compulsory. There is testimony that the whiskey of the appellant was actually in the warehouse of the appellee, that the appellee's general manager and treasurer refused to release it unless the appellant's agent paid Aylward $8,000, and that he also declined to furnish a statement of the charges against the whiskey until this payment was made. There was also testimony that Garvey had to secure possession of the whiskey promptly so that it would be shipped on the steamship City of Flint, as his principal had contracted to deliver it to the purchasers in Scotland on that vessel and arrangements for its transportation by that ship had been made. Delay beyond January 4, 1923, meant that neither the transportation contract nor the contract of sale could be complied with, and these defaults would doubtless have resulted in loss to the owner. We think these facts and circumstances, if found by the jury to exist, would be sufficient to sustain a finding that the payment of the appellant was a compulsory one, unless the appellant had an adequate legal remedy for the recovery of the goods, and chose to pay the money rather than resort to that remedy. * * * It is difficult, if not impossible, to imagine a case in which some legal remedy for the recovery of goods would not be open to their owner, but the law does not require the owner to adopt such a remedy unless it is an adequate one, and if the use of the remedy would cause great inconvenience or loss it is not considered adequate. In that case the court points out that, while there may have been a legal remedy in the action of trover or replevin, it was not an adequate one, and therefore the party paying the money did so under compulsion and could recover it back. No one can properly be said to have paid money under compulsion in the absence of a showing that the refusal to comply with the demand for payment would have prejudiced him or resulted in a loss to him. It must be shown that a noncompliance with the demand would have resulted in placing the one making payment in a worse position than if payment had been made. In this case there was a compliance by the plaintiff with an

illegal demand for the payment of money. Its refusal would not have resulted in the loss of a penny to the plaintiff. Neither would the delay or inconvenience have been in the slightest degree lengthened or increased by resorting to the adequate legal remedy which was open to him, to recover any loss sustained by him through the unauthorized acts of the defendants. Under such circumstances, it must be held that the action taken by the plaintiff was voluntary and not the result of such duress as would entitle him to recover the money back.

*Judgment affirmed, with costs to the appellee.*